Glenn C. BECKMAN and Charlene K. Beckman, and Glenn Beckman Chevrolet, Buick, Pontiac, Ltd., an Iowa Corporation, Appellants,

v.

Virgil CARSON and Carson Motors, an Iowa Corporation, Appellees.

No. 84–922.

Supreme Court of Iowa.

July 31, 1985.

Bruce L. Braley and David J. Dutton of Mosier, Thomas, Beatty, Dutton, Braun & Staack, Waterloo, for appellants.

Max E. Kirk and Philip A. Hershner of Ball, Kirk, Holm & Nardini, P.C., Waterloo, for appellees.

Considered by REYNOLDSON, C.J., and McCORMICK, SCHULTZ, CARTER, and WOLLE, JJ.

WOLLE, Justice.

The plaintiffs, a corporate automobile dealership (Beckman Chevrolet) and its owners Glenn C. and Charlene K. Beckman, brought this breach of contract action against Carson Motors, a prospective corporate buyer of certain dealership assets, and Virgil Carson (Carson), its sole officer and stockholder. Pursuant to two written agreements—a "sales agreement" and related "interim agreement"—Carson Motors as agent for the plaintiffs commenced operating Beckman Chevrolet on a temporary basis, anticipating that within about two months it could secure franchise agreements with General Motors (GM), obtain its own Iowa dealer's license, and then complete its purchase of the assets of Beckman Chevrolet. Plaintiffs claimed that defendants breached the agreements when they withdrew from the transaction sixteen days after the agreements were executed. Defendants Carson Motors and Carson alleged in their answer and counterclaim that they were entitled to rescind the agreements because during this interim period Beckman Chevrolet surrendered its Iowa dealer's license, an act constituting a substantial breach of the agreements. Following a bench trial, the trial court found that Carson Motors was entitled to rescission and rendered judgment for defendants. On appeal, plaintiffs contend that the court erred (1) in failing to apply to this transaction Iowa Code chapter 322A concerning motor vehicle franchisers, (2) in finding that Beckman Chevrolet had substantially breached its agreements with Carson Motors, and (3) in overruling objections to certain testimony presented by defendants. We find no error and affirm.

In 1981 Beckman Chevrolet purchased the inventory and business assets of an automobile dealership in Traer, Iowa, and the Beckmans in their individual names purchased the real estate on which it was located. Beckman Chevrolet then obtained an Iowa dealer's license and became an authorized dealer of the Chevrolet, Buick and Pontiac divisions of GM by entering into franchise agreements with them. In early 1981, the Beckmans entered into negotiations to sell Beckman Chevrolet to Carson, a longtime friend with whom they previously had business dealings. The negotiations culminated in two agreements prepared by the Beckmans' attorney and executed by the corporate entities on June 3, 1981.

Under the sales agreement, Carson Motors agreed to purchase certain listed assets of Beckman Chevrolet—motor vehicles, parts and accessories, and other business assets—and also agreed to purchase the business premises from the Beckmans. Beckman Chevrolet was to retain ownership of certain other assets, including its accounts receivable. The corporate assets were to be delivered to Carson Motors on the date of final closing, to take place "within 15 days of the date of receipt of approval of this agreement and transfer of the dealership by General Motors, or approval of Buyer as dealer by General Motors." The sales agreement also contained the following clause concerning the Beckman Chevrolet franchises with GM and its divisions:

Seller's Notice to General Motors. Immediately upon the execution and delivery of this agreement, the Seller shall notify Chevrolet Division, Pontiac Division and Buick Division of General Motors of this agreement and contemplated transfer from Seller to Buyer, and Seller shall cooperate with Buyer in the processing of Buyer's application to become a dealer. Buyer will, immediately upon execution and delivery of this agreement, file the necessary application with Chevrolet Division, Pontiac Division and Buick

Division of General Motors to assume this dealership and shall proceed to process said application with diligence in order to qualify as dealer in lieu of Seller. It is expressly agreed and understood that the obligation of both parties to close this transaction is conditioned upon Buyer receiving a signed dealer sales and service agreement from said divisions of General Motors on or before the 15th day of June, 1981. In the event said dealer's agreement cannot be obtained from said divisions of General Motors on or before the 15th day of June, 1981, this agreement in its entirety, and the escrow agreement, which is part hereof, shall be null and void and all monies shall be returned to Buyer.

An interim agreement, executed simultaneously with the sales agreement, provided that Carson Motors would operate Beckman Chevrolet as its agent until Carson Motors was approved as an authorized dealer by GM. Carson Motors was to retain all profits generated during the interim period, subject to a monthly rental fee owing to Beckman Chevrolet for use of the facilities. One effect of the interim agreement was to extend beyond June 15, 1981, the time within which Carson Motors might obtain signed dealer's agreements with the designated divisions of GM; but the interim agreement retained the condition that GM approve Carson Motors as an authorized dealer in Traer before the sale could be completed.

Carson Motors began managing Beckman Chevrolet as its agent on June 8, 1981, operating under the Iowa dealer's license and GM franchises of Beckman Chevrolet. The death knell for the sales transaction sounded on June 15, 1981, when Glenn Beckman decided to surrender the Beckman Chevrolet dealer's license to the Iowa Department of Transportation. Beckman had previously pleaded guilty to tampering with odometers, and before the agreements with Carson Motors were signed he had been notified that the department would be holding a hearing on whether the Iowa dealer's license should be revoked because of those violations. Before the hearing

scheduled for June 15, and without notifying Carson that he would do so, Beckman voluntarily surrendered the dealer's license, with revocation to be effective on June 19. Beckman testified that he did so to avoid the adverse publicity which a license revocation hearing might have engendered. Beckman said he believed Carson Motors had the right at that time to obtain its own Iowa dealer's license from the department and further understood that if Carson Motors would apply for its own license the department would immediately issue the license and authorize Carson Motors to operate under the GM franchises of Beckman Motors. On June 19, however, Carson notified the Beckmans that Carson Motors was not going to complete the purchase, stating that revocation of the Iowa license of Beckman Chevrolet was one of the reasons he was withdrawing from the transaction.

Plaintiffs' petition at law sought compensatory and punitive damages on the theory that Carson Motors and Carson had wrongfully breached the sales and interim agreements. Defendants included in their answers and counterclaims the contention that revocation of the Beckman Chevrolet dealer's license constituted a substantial breach of the agreements, warranting rescission.

■ Following a bench trial, the trial court first determined that Iowa Code section 322A.12 (1981) did not automatically transfer the GM franchise to Carson Motors, then concluded that Carson Motors was entitled to rescission because plaintiffs had substantially breached the agreements. Our review of plaintiffs' assignments of error is at law, not de novo, because this action was filed and tried as an action at law. Iowa R.App.P. 4, 14(f)(1).

*I. Construction of Iowa Code section 322A.12 (1981).*

Plaintiffs contend that the revocation of Beckman Chevrolet's Iowa dealer's license did not constitute a substantial breach of the agreements because Iowa Code section 322A.12 (1981) automatically transferred to

Carson Motors all of its rights under the GM franchises. That statute provides:

> Notwithstanding the terms, provisions, or conditions of any agreement or franchise, subject to the provisions of subsection 2 of section 322A.11, in the event of the sale or transfer of ownership of the franchisee's dealership by sale or transfer of the business or by stock transfer or in the event of change in the executive management of the franchisee's dealership the franchiser shall give effect to such a change in the franchise unless the transfer of the franchisee's license under chapter 322 is denied or the new owner is unable to obtain a license under said chapter, as the case may be.

The trial court found section 322A.12 inapplicable here for two reasons. It found that the transaction involved only a sale of assets, not a sale of the dealership or franchise, and it then found:

> The agreement between the parties also contemplated all along that the defendant would make application for and obtain his own franchises from the various divisions of General Motors.

We need not decide whether the form of this transaction—a sale of business assets—fell outside the scope of section 322A.12, because we agree with the second reason given by the trial court. The agreements clearly expressed the parties' intent that interim operation of the business would be conducted under the established license and franchises of Beckman Chevrolet. A principal purpose of the interim agreement was to continue the existing operation "until approval of buyer as dealer by Chevrolet, Pontiac and Buick divisions of GM," and the sales agreement explicitly provided that closing of the sales transaction was "conditioned upon buyer receiving a signed dealer sales and service agreement from said divisions of General Motors." Even though the interim agreement extended the time for obtaining such franchise agreements beyond the June 15 deadline of the sales agreement, the parties' agreements contemplated that there would be no completed sale unless and until Carson Motors received from GM and its divisions its own signed franchise agreements. The parties entered into the interim agreement because they understood it would take from six weeks to two months for Carson Motors to obtain appropriate franchises. It had taken that long for Beckman Chevrolet to obtain its own franchise agreements two years earlier.

The trial court correctly ascertained from the written contracts the intent of the parties that section 322A.12 would not apply to this transaction. *See* Iowa R.App.P. 14(f)(14) (in construing written contracts, the intent of the parties must control and is determined by what the contract says). The parties did not intend that Carson Motors would obtain its franchises by operation of law; they intended that Carson Motors would obtain its own franchise agreements from GM and its divisions before the sale could be completed.

■ Iowa Code chapter 322A was primarily designed to assure the public that motor vehicle franchisers would not, without good cause, terminate or discontinue dealerships or open additional dealerships in any Iowa community. The preamble to chapter 322 discloses that the statute was enacted "to provide for fair trade practices by motor vehicle franchisers." 1970 Iowa Acts ch. 1160, p. 206. *See* Iowa Code § 4.6 (1981) (in construing a statute we properly may consider its legislative history, including the object sought to be attained as reflected in the preamble or statement of policy). The statute entitles the seller and purchaser of a dealership to obtain injunctive relief compelling a franchiser to recognize a change in the franchise. *See Buckwalter Motors, Inc. v. General Motors Corp.*, 593 F.Supp. 628, 633 (S.D.Iowa 1984). But the statute's target was franchisers, not sellers or buyers of dealerships. Carson Motors had a right, not affected by the statute, to rely on those provisions of its sales and interim agreements with Beckman Chevrolet which conditioned its obligation to close the transaction "upon Buyer receiving a signed dealer sales and service agreement" from the GM

divisions with whom Beckman had franchise agreements.

The trial court did not err in deciding that Iowa Code section 322A.12 (1981) had no application to the circumstances of this case.

II. *Surrender of the Dealer's License was a Substantial Breach.*

Plaintiffs contend that the trial court erred in finding that their surrender of Beckman Chevrolet's Iowa license constituted a substantial breach of the agreements, warranting rescission. We disagree, concluding that substantial evidence and applicable legal principles support the trial court's decision.

A party may obtain rescisssion of a contract where the other party's breach is so substantial as to defeat the object of the contracting parties. *See Nora Springs Cooperative Co. v. Brandau,* 247 N.W.2d 744, 749 (Iowa 1976); *Maytag Co. v. Alward,* 253 Iowa 455, 464–66, 112 N.W.2d 654, 659–60 (1962). *See generally,* 6 A. Corbin, *Contracts* §§ 1353–54 (1962). As we explained in *Binkholder v. Carpenter,* 260 Iowa 1297, 152 N.W.2d 593 (1967):

> "Rescission", as used in connection with the cancellation or termination of contracts, has two connotations. A contract may be rescinded by the acts of one of the parties and does not require court action except such action at law as may be necessary to restore the status quo.

*Id.* at 1302, 152 N.W.2d at 596 (distinguishing rescission decreed by a court of equity from recission effected by notice given by one contracting party to the other).

Substantial evidence supports the trial court's finding that the surrender and subsequent revocation of the license of Beckman Chevrolet constituted a substantial breach of several provisions of the parties' agreements, defeating their purpose. The Beckman dealership was obligated "to conduct the operation of the dealership until final closing in the regular, usual and normal course of business and in accordance with all applicable laws, rules and regulations," albeit with Carson Motors as

its agent during the interim period. Certainly the revocation of the Iowa dealer's license constituted a major breach of that provision, particularly in view of the fact that the Beckman Chevrolet franchise agreements with GM and its divisions provided that loss of the Iowa dealer's license constituted grounds for termination of those franchises.

Moreover, the parties understood from the inception of their contractual undertaking, and must have known when the dealer's license was revoked, that Carson Motors would be unable to obtain its own franchise agreements for several weeks. Carson Motors had conditioned closing of the sale on its securing of those vital agreements. Uninterrupted operation of the dealership and obtaining of satisfactory franchise agreements were basic assumptions on which the agreements were made. *See* Restatement (Second) of Contracts § 261 (1981):

> Where, after a contract is made, a party's performance is made impracticable without his fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made, his duty to render that performance is discharged, unless the language or the circumstances indicate the contrary.

Carson Motors was fully justified in deciding to withdraw from its agreements with Beckman Chevrolet when it learned that Beckman, without Carson's knowledge, had surrendered the license under which the dealership was being operated.

Plaintiffs argue that when Carson learned of the surrender and impending revocation of the Iowa license of Beckman Chevrolet, he should have immediately applied for a dealer's license for Carson Motors and then relied on Iowa Code section 322A.12 (1981) to provide it with franchise agreements by operation of law. For reasons we have set forth in division I, however, that statute was not intended to apply to this transaction in that fashion. Carson Motors was entitled to rely on the condition in its agreements that it receive franchise agreements from GM before closing the sale.

The trial court did not err in finding Carson Motors entitled to rescission of its agreements with the Beckman dealership.

### III. *The Evidentiary Ruling.*

 Plaintiffs also contend that the trial court erred in overruling their hearsay and foundational objections to questions which elicited the following testimony by Carson:

Q. What was your understanding concerning whether or not you would be allowed by General Motors to sell Chevrolet automobiles until you have been finally approved by General Motors?

. . . .

A. I was told I couldn't sell any new cars, parts or do any warranty work or order any new cars until I was approved by General Motors.

. . . .

Q. What was the basis upon which you refused to honor the contract?

. . . .

A. I was told I couldn't sell anything down there for eight to ten weeks until I was approved by General Motors, other than used cars.

The trial court did not err in overruling plaintiffs' hearsay objection because the testimony was not hearsay. Iowa Rule of Evidence 801(c) defines hearsay as follows:

"Hearsay" is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.

The questions asked of Carson disclosed that the purpose of the testimony was not to establish the truth of what was said by someone other than Carson. . Rather, the purpose of the questions was to elicit an explanation why Carson had decided not to proceed with the contracts with plaintiffs. *See State v. Coburn,* 315 N.W.2d 742, 746 (Iowa 1982) (statement of declarant not hearsay if offered only to explain responsive conduct); *Westway Trading Corp. v. River Terminal Corp.,* 314 N.W.2d 398, 402 (Iowa 1982) (documents not hearsay if offered as circumstantial evidence of state of mind of parties); *State v. Rush,* 242 N.W.2d 313, 319 (Iowa 1976) (statement not hearsay if offered only to show its effect on the hearer). We presume the trial court received the evidence for the limited non-hearsay purpose disclosed by the wording of the two questions.

 Neither is there merit to plaintiffs' contention that the trial court should have sustained their foundational objection to the testimony. Plaintiffs' sole foundational objection to those questions was that Carson was expressing an opinion which was "contrary to Iowa law and chapter 322A.12 and .11 ..., which are the existing law as impact upon the existence of a franchise." As explained in division I, that statute was inapplicable here. On appeal, plaintiffs argue that defendants did not lay a sufficient foundation for authentication or identification of a telephone conversation as required by Iowa Rule of Evidence 901(b)(6), but that specific objection was not made during the trial and was waived. *See* Iowa R.Evid. 103 (a)(1) ("Error may not be predicated upon a ruling which admits ... evidence unless ... a timely objection or motion to strike appears of record, stating the specific ground of objection....").

We find no merit in the plaintiffs' assignments of error.

AFFIRMED.