**MIDWEST AUTOMOTIVE III,
LLC d/b/a Dave Ostrem
Imports, Appellant,**

v.

**IOWA DEPARTMENT OF TRANSPOR-
TATION and Jaguar Cars, a division
of Ford Motor Company, Appellees.**

No. 01–0521.

Supreme Court of Iowa.

June 12, 2002.

John F. Lorentzen of Nyemaster, Goode, Voigts, West, Hansell & O'Brien, P.C., Des Moines, and Eric L. Chase of Bressler, Amery & Ross, P.C., Florham Park, New Jersey, for appellant.

Thomas J. Miller, Attorney General, David A. Ferree, Special Assistant Attorney General, and Mark Hunacek, Assistant Attorney General, Iowa Department of Transportation, for appellee Iowa Department of Transportation.

Robert Holz of Davis, Brown, Koehn, Shors & Roberts, Des Moines, and Carl J. Chiappa and Jason P. Isralowitz of Kirkpatrick & Lockhart LLP, New York, New York, for appellee Jaguar Cars.

Martha Martell, West Des Moines, and David L. Brown of Hansen, McClintock & Riley, Des Moines, for amicus curiae Iowa Automobile Dealers Association.

TERNUS, Justice.

The appellant, Midwest Automotive III, LLC ("Midwest Auto"), purchased a Des Moines car dealership from Dave Ostrem Imports, Inc. ("Ostrem Imports"). This judicial review proceeding arises from appellee Jaguar Cars' attempt to terminate a

Jaguar franchise transferred to Midwest Auto by Ostrem Imports. The appellee, Iowa Department of Transportation (DOT), granted Jaguar Cars' application to terminate the franchise, finding the change in ownership would be "substantially detrimental to the distribution of [Jaguar Cars'] motor vehicles in the community." Iowa Code § 322A.11 (1999). This decision was affirmed by the district court.

Midwest Auto now appeals to this court, alleging several errors. Finding none, we affirm.

### I. Background Facts and Proceedings.

Jaguar Cars, a division of Ford Motor Company, is the exclusive authorized distributor of Jaguar vehicles, parts, and accessories in the United States. Jaguar Cars distributes these products through a network of authorized dealers—franchisees—that engage in the retail sale and servicing of Jaguar vehicles under the Jaguar trademark.

In 1999, Ostrem Imports was an authorized Jaguar dealer in the Des Moines area pursuant to a franchise agreement it had with Jaguar Cars. (Ostrem Imports also sold BMW, Mercedes–Benz, and Volvo automobiles.) In April of 1999, Ostrem Imports entered into a contract to sell its dealership to Midwest Auto. Although the Jaguar franchise held by Ostrem Imports was not transferable to another dealer without Jaguar Cars' permission, the contract between Midwest Auto and Ostrem Imports was not conditioned on Jaguar Cars' approval of Midwest Auto as a new franchisee.

After the contract between Ostrem Imports and Midwest Auto was signed, the principal owner of Midwest Auto, Planet Automotive Group, Inc. (Planet Automotive), notified Jaguar Cars of the impending sale. Jaguar Cars then initiated its usual process for reviewing the proposed buyer of the dealership. As part of this process, Midwest Auto was required to submit an application and three years of customer satisfaction index (CSI) data for all franchises with which its owners had been associated. CSI data is compiled from customer survey responses that are intended to measure how well dealers treat their customers and satisfy their customers' needs with respect to both sales and service.

Planet Automotive supplied CSI data from dealerships it operated, as well as CSI scores from dealerships in which its shareholders, brothers Robert and Alan Potamkin, had an interest. Despite Jaguar Cars' request for CSI data from all Planet Automotive and Potamkin dealerships, Planet Automotive supplied only 136 out of a possible 216 CSI sales and service scores.

The CSI information submitted by Planet Automotive was crucial to Midwest Auto's approval as a new franchisee because Jaguar Cars requires above-average CSI ratings as a "gateway" criterion. If the majority of an applicant's CSI scores are below the national average for the same line-make, Jaguar Cars conducts no further review and simply declines approval of the proposed franchisee. Only if the majority of scores are above average will Jaguar move to the next stage of the approval process at which time the substance of the buyer's application is evaluated.

Midwest Auto's application never progressed to the second stage of the approval process because a majority of the submitted CSI scores fell below the national average. Out of the 136 scores tendered, 95 were below average, 38 were above average, and 3 were at the national average. Based on this data, Jaguar Cars rejected Midwest Auto's application to become an authorized Jaguar dealer. Pursu-

ant to Iowa Code section 322A.6, Jaguar Cars then filed an application with the DOT to terminate the franchise, claiming that a transfer of ownership of the Ostrem Imports dealership would be substantially detrimental to the distribution of Jaguar vehicles in the community.

Meanwhile, Midwest Auto's purchase of Ostrem Imports' dealership was concluded. One day after the sale the DOT issued a license to Midwest Auto authorizing it to sell four makes of car, including Jaguar.

Subsequently, upon Jaguar Cars' request, an administrative law judge (ALJ) with the department of inspections and appeals scheduled a hearing on Jaguar Cars' application to terminate Midwest Auto's franchise. *See* Iowa Code § 322A.7 (requiring DOT to notify department of inspections and appeals of application for purpose of holding hearing). After a five-day evidentiary hearing, the ALJ issued a ruling approving termination of the franchise. The ALJ gave "substantial weight" to the CSI scores, concluding they were a reasonable tool to measure customer satisfaction. Based upon this evidence and other testimony we will review later in this opinion, the ALJ held Jaguar Cars had carried its burden to prove "that a Jaguar dealership operated by Midwest would be substantially detrimental to the distribution of Jaguar vehicles in the community."

In an intra-agency appeal, the DOT upheld the ALJ's ruling, adopting the findings of fact and conclusions of law set forth in the ALJ's decision. *See id.* § 322A.17 (providing for DOT review of decision made by department of inspections and appeals). Midwest Auto fared no better on judicial review. The district court affirmed the agency's decision, refusing to consider Midwest Auto's proffered evidence of its post-hearing performance as a Jaguar dealer. *See id.* (stating DOT decision is final agency action and providing for judicial review of that decision). Midwest Auto has now appealed to this court.

## II. *General Scope of Review.*

Decisions of the DOT are subject to judicial review under Iowa's Administrative Procedure Act, Iowa Code chapter 17A. *Peterson v. Iowa Dep't of Transp.,* 508 N.W.2d 689, 691 (Iowa 1993). Because this proceeding was commenced before the agency after July 1, 1999, the extensive amendments to chapter 17A enacted in 1998 govern our review. *See* 1998 Iowa Acts ch. 1202, § 46. These amendments, as they relate to judicial review, were intended to specify in greater detail the standards to be applied by a court when it reviews agency action. *See* H.F. 667 Explanation, 77th Gen. Assem., Reg. Sess. (Iowa 1998).

A party may seek judicial relief when its substantial rights have been prejudiced because the agency's action meets any one of several statutory criteria. Iowa Code § 17A.19(10) (Supp.1999). The criteria implicated here include the following:

the agency action is . . .

. . . .

c. Based upon an erroneous interpretation of a provision of law whose interpretation has not clearly been vested by a provision of law in the discretion of the agency.

. . . .

f. Based upon a determination of fact clearly vested by a provision of law in the discretion of the agency that is not supported by substantial evidence in the record before the court when that record is viewed as a whole . . . .

. . . .

h. Action other than a rule that is inconsistent with the agency's prior practice or precedents, unless the agency has justified that inconsistency by stating

credible reasons sufficient to indicate a fair and rational basis for the inconsistency.

j. The product of a decision-making process in which the agency did not consider a relevant and important matter relating to the propriety or desirability of the action in question that a rational decision maker in similar circumstances would have considered prior to taking that action.

. . .

n. Otherwise unreasonable, arbitrary, capricious, or an abuse of discretion.

*Id.* § 17A.19(10).

■ Although the 1998 amendments to chapter 17A elaborated on the standards for judicial review of agency action, the nature of that review was not altered: the court reviews an agency decision for correction of errors of law. *PanDa Eng'r v. Eng'r & Land Surveying Examining Bd.,* 621 N.W.2d 196, 198 (Iowa 2001). Thus, the fundamental principle of administrative law remains the same: "administrative decisions are to be made by the agencies, and not by the courts." *Leonard v. Iowa State Bd. of Educ.,* 471 N.W.2d 815, 815 (Iowa 1991).

### III. *Issues on Appeal.*

■ The issues raised by Midwest Auto on appeal, although multi-faceted, can be placed into three general categories: (1) the DOT erred in its interpretation of chapter 322A; (2) the DOT's decision is not supported by substantial evidence; and (3) the agency decision is inconsistent with prior DOT decisions. We do not consider Midwest Auto's allegation that Jaguar Cars failed to prove another dealer would be granted a Jaguar franchise to serve the interests of consumers in the Des Moines area, as required by Iowa Code section 322A.2. That argument was first made in Midwest Auto's reply brief

and is, therefore, waived. *See Goodell v. Humboldt County,* 575 N.W.2d 486, 493 n. 8 (Iowa 1998); *Goodenow v. City Council,* 574 N.W.2d 18, 27 (Iowa 1998).

Although we will address only the three issues listed above, we have not ignored Midwest Auto's claim that the DOT's decision was also unreasonable, arbitrary, and capricious and constitutes an abuse of discretion. In examining the arguments made to support these claims, we have concluded they duplicate arguments made with respect to the alleged deficiency in the evidence to support the agency's factual findings. Therefore, to avoid unduly lengthening this opinion, we will consider the arguments advanced by Midwest Auto in connection with its claim of unreasonable, arbitrary, capricious, and abusive agency action when we analyze the adequacy of the evidence.

### IV. *Did the DOT Base its Decision on an Erroneous Interpretation of Chapter 322A?*

■ A. *Standard of review.* Despite our recognition that administrative decisions are the prerogative of agencies, "the final interpretation of the law rests with this court." *Noble v. Lamoni Prods.,* 512 N.W.2d 290, 292 (Iowa 1994). We give weight to an agency's reading of the law within its area of expertise, but we make "an independent determination of the meaning of pertinent statutes." *Greater Cmty. Hosp. v. Pub. Employment Relations Bd.,* 553 N.W.2d 869, 871 (Iowa 1996). Thus, the rule is one of "limited deference" to the agency on issues of law. *Dico, Inc. v. Iowa Employment Appeal Bd.,* 576 N.W.2d 352, 354 (Iowa 1998).

■ We reject the suggestion of amicus curiae that the agency decision rendered in this case is entitled to no deference because the ALJ and the reviewing officer

from the DOT allegedly have "no special experience" in hearing motor vehicle franchise termination cases, an assertion without support in the record. Even if this allegation is accurate, the court will not engage in a case-by-case evaluation of the expertise and experience of the administrative law judge and reviewing officer to determine what deference will be given to their interpretation of the governing law.

■ We also reject the invitation to give no deference to the agency's decision simply because the reviewing officer incorporated the ALJ's findings of fact and conclusions of law into her decision. The reviewing officer stated in her ruling that the ALJ's decision was "well thought out and thorough." Under this circumstance an independent rewriting of the findings of fact and conclusions of law on intra-agency review was not required.[1]

B. *Statutory framework.* In order to understand Midwest Auto's criticism of the agency's interpretation of the relevant law, it is helpful to first review the statutory framework within which the DOT made its decision. In 1970, the Iowa legislature passed a law "to provide for fair trade practices by motor vehicle franchisers." 1970 Iowa Acts ch. 1160 Preamble. This law was codified in Iowa Code chapter 322A. We have held that the primary purpose of chapter 322A is to protect the public—to ensure that once franchises are established in a community, the requisite services are continued for the benefit and safety of vehicle buyers and the public at large. *Craig Foster Ford, Inc. v. Iowa Dep't of Transp.,* 562 N.W.2d 618, 621–22

(Iowa 1997); *Beckman v. Carson,* 372 N.W.2d 203, 207 (Iowa 1985).

Of relevance to this case is section 322A.12, addressing changes in the ownership of dealerships. This provision requires a franchiser faced with the sale of a dealership to recognize the transfer unless the new franchisee does not obtain a license under chapter 322. Iowa Code § 322A.12 (1999). This requirement applies notwithstanding any contrary term in the franchise agreement. *Id.*

Chapter 322A does, however, allow a franchiser to terminate a franchise agreement upon approval by the DOT. The franchiser obtains approval by first filing an application with the DOT for permission to terminate the franchise. *Id.* § 322A.6. A hearing is then held, at which time the franchiser must establish (1) it "has good cause for termination," and (2) upon termination, "another franchise in the same line-make will become effective in the same community, without diminution of the motor vehicle service formerly provided." *Id.* § 322A.2.

The "good cause" requirement is not defined in the statute, but "guidelines" are provided that instruct the agency to consider a nonexclusive list of "existing circumstances." *Id.* § 322A.15. In addition, the legislature has included a list of circumstances that do *not* constitute good cause. *Id.* § 322A.11. Section 322A.11 provides in pertinent part:

Notwithstanding the terms, provisions or conditions of any agreement or franchise, the following shall not constitute

**1.** The situation addressed in this opinion should be distinguished from the conduct we have criticized in our cases where a district court, acting as a fact finder, adopts verbatim one of the party's proposed findings of fact and conclusions of law. *See, e.g., Rubes v. Mega Life & Health Ins. Co.,* 642 N.W.2d 263, 266 (Iowa 2002); *Kroblin v. RDR Motels, Inc.,* 347 N.W.2d 430, 435 (Iowa 1984). Here the reviewing officer acted in an appellate capacity, not as the initial decision maker. *See* Iowa Code § 322A.17 (providing for DOT "review" of the ALJ's decision).

good cause for the termination or non-continuation of a franchise . . .

. . . .

2. The change of ownership of the franchisee's dealership . . ., *unless the franchiser, having the burden of proof, proves that such change of ownership . . . will be substantially detrimental to the distribution of franchiser's motor vehicles in the community.*

*Id.* § 322A.11(2) (emphasis added). We now address Midwest Auto's concerns about the agency's interpretation of this statute.

C. *Midwest Auto's contentions.* Midwest Auto has two complaints with respect to the legal principles applied by the DOT in resolving this matter. First, it claims that the agency erroneously interpreted chapter 322A to permit a finding of good cause based on the existence of one fact—a change in ownership causing substantial detriment to the distribution of the franchiser's motor vehicles. Second, Midwest Auto argues the agency erred in its definition of the phrase "substantially detrimental" by failing to consider whether sales levels would be adversely affected by the change in ownership.

■ 1. *Good cause.* Midwest Auto asserts that chapter 322A does not permit the requirement of "good cause" to rest on one factor—here a transfer of ownership of the dealership. Citing Iowa Code section 322A.15, it argues the guidelines set forth in that provision require that a finding of "good cause" rest on multiple factors. Midwest Auto also relies on a 2001 amendment to chapter 322A as clarifying legislative intent that the test for "good cause" in the context of a change in dealer ownership is multifactored. *See generally* 2001 Iowa Acts ch. 32, §§ 36, 37 (codified at Iowa Code § 322A.11 (Supp.2001)).

As noted earlier a franchiser must have good cause to terminate a franchise agreement. *See* Iowa Code § 322A.2(1) (1999). In section 322A.15, the legislature instructs the agency to consider several factors in making a determination of good cause. *See id.* § 322A.15. In contrast to this general provision requiring consideration of various circumstances as they relate to good cause, section 322A.11(2) specifically addresses the impact of a change in dealer ownership on a determination of good cause. Section 322A.11(2) states that such a change does not constitute good cause *unless* the franchiser proves substantial detriment to the distribution of its vehicles in the community. *Id.* § 322A.11(2). Thus, if a franchiser *is* able to prove substantial detriment, a change in ownership *can* constitute good cause.

Midwest Auto argues that when substantial detriment is established section 322A.11(2) merely permits the agency to consider the change in ownership as one of several factors in its assessment of good cause. Yet there is nothing in section 322A.11(2) to indicate that once substantial detriment is shown the change in ownership simply becomes another circumstance to consider in determining good cause. Rather, as we have just discussed, a plain reading of the statutory language leads to a contrary interpretation, namely, that a change in ownership constitutes good cause when the franchiser proves substantial detriment.

■ Based on our interpretation of section 322A.11(2), we do not agree with Midwest Auto's assertion that the 2001 amendments to chapter 322A simply clarified legislative intent. Midwest Auto's position is contrary to the well-established principle that we consider legislative history to ascertain legislative intent only when a statute is ambiguous. *State ex rel. Miller v. Midwest Pork, L.C.,* 625 N.W.2d 694,

700 (Iowa 2001) (citing Iowa Code § 4.6). Ambiguity may arise from specific language used in a statute or when the provision at issue is considered in the context of the entire statute or related statutes. *Id.* Neither Midwest Auto nor amicus curiae has pointed to specific language in section 322A.11(2) that is subject to more than one reasonable interpretation. *See id.* ("'A statutory provision is ambiguous if reasonable persons can disagree as to its application.'" (Citation omitted.)). Nor have they identified an ambiguity arising from the context in which section 322A.11(2) exists.

In addition, our independent evaluation of the statute reveals no ambiguity. As we have already discussed, the language of section 322A.11(2) is clear. To the extent section 322A.11(2) can be said to conflict with section 322A.15, section 322A.11(2), dealing with a specific situation (the existence of good cause based on a transfer of ownership), operates as an exception to section 322A.15, dealing with good cause in general. *See* Iowa Code § 4.7 (stating that where irreconcilable conflict exists between two statutes, "the special or local provision prevails as an exception to the general provision"). Thus, our own review of chapter 322A reveals no ambiguity that would necessitate consideration of the recent amendments to section 322A.11(2).

Even if we consider legislative history as Midwest Auto urges us to do, it would not change our interpretation of the statute. The 2001 amendments changed the prefatory language of section 322A.11 in a significant way. *See* 2001 Iowa Acts ch. 32, § 36 (codified at Iowa Code § 322A.11 (Supp.2001)). Originally this section said: "the following shall not constitute good cause." Iowa Code § 322A.11 (1999). After the amendment it reads: "the following shall not be considered facts supporting a finding of good cause." Iowa Code

§ 322A.11 (Supp.2001). In addition subparagraph (2) was amended so that, in addition to showing substantial detriment, a franchiser relying on a change of ownership to prove good cause must also establish "that good cause for the termination or noncontinuation of the franchise ... *otherwise exists.*" 2001 Iowa Acts ch. 32, § 37 (emphasis added) (codified at Iowa Code § 322A.11(2) (Supp.2001)).

■ We think these amendments clearly shifted the focus of section 322A.11(2). Rather than setting forth the circumstances under which a change of ownership constitutes good cause, this section now sets forth the circumstances under which a change in ownership may be considered as one factor, among others, that would support a finding of good cause. Such a material modification of statutory language raises a presumption that a change in the law was intended. *State v. Ahitow,* 544 N.W.2d 270, 273 (Iowa 1996) (stating "any material change in the language of a statute is presumed to alter the law"); *Anderson v. W. Hodgeman & Sons, Inc.,* 524 N.W.2d 418, 420 (Iowa 1994) ("One rule of statutory construction is that 'an amendment intended some change in existing law.'" (Citation omitted.)); 1A Norman J. Singer, *Statutes and Statutory Construction* § 22.30, at 358–61 (6th ed. 2002 Rev.) [hereinafter "*Statutes and Statutory Construction*"]; *cf. Barnett v. Durant Cmty. Sch. Dist.,* 249 N.W.2d 626, 629 (Iowa 1977) (stating that an intent to change the law is more likely when the original statute "'was subject to very serious doubt'" and was "'changed in only minor details'" by a subsequent amendment (citation omitted)). This presumption of intent to change existing law is particularly strong when the amendment follows a contrary executive or judicial interpretation of an unambiguous statute. *State v. Phelps,* 417 N.W.2d 460, 462 (Iowa

1988); *State v. Beeman*, 315 N.W.2d 770, 777 (Iowa 1982); *Statutes and Statutory Construction* § 22.30, at 366–68; *cf. Boone State Bank & Trust Co. v. Westfield Ins. Co.*, 298 N.W.2d 315, 317–18 (Iowa 1980) (finding intent to clarify law where amendment addressed doubtful language in original statute that had been subject to varying interpretations in other jurisdictions). Of course, here, the 2001 amendment followed the DOT's decision in this case, applying an interpretation of section 322A.11(2) at odds with the amendment.

In conclusion, we find no error in the agency's interpretation of section 322A.11(2) to the effect that this provision eliminates the need to consider the circumstances listed in section 322A.15 when substantial detriment is found. The DOT properly interpreted section 322A.11(2) to mean that a franchiser could establish good cause for termination of a franchise agreement if it proved that a change in dealer ownership would be substantially detrimental to the distribution of its vehicles in the community.

■ 2. *Substantially detrimental.* Midwest Auto also asserts the DOT applied an erroneous definition of the term "substantially detrimental" because it did not require proof that the change in ownership would have an adverse effect on sales. It contends the DOT employed a "business judgment rule, pursuant to which any action passes muster so long as it is 'rationally based' upon a legitimate business objective."

■ We start our analysis with the general rule that in the absence of a legislative definition or a peculiar meaning in law, statutory terms are given their ordinary meaning. *See Ahitow*, 544 N.W.2d at 272. With respect to the statutory phrase—"substantially detrimental to the distribution of franchiser's motor vehicles in the community"—only the terms "com-

munity" and "franchiser" are defined in chapter 322A. *See* Iowa Code § 322A.1(1), (6) (1999). Because there is no dispute that Jaguar Cars is a "franchiser," we turn to the statutory definition of the word "community." That word is defined as "the franchisee's area of responsibility as stipulated in the franchise." *Id.* § 322A.1(1). For the remaining relevant terms used in section 322A.11(2), we look to the dictionary. *See Ahitow*, 544 N.W.2d at 272.

The dictionary defines "substantially" as: "in a substantial manner: so as to be substantial." *Webster's Third New International Dictionary* 2280 (unabr. ed.1993). The word "substantial" is defined as "material," "important," or "essential." *Id.* It is also defined as "considerable in amount, value, or worth." *Id.* "Detrimental" is defined as "harmful or damaging." *Id.* at 617. The dictionary defines the term "distribution," as it relates to commerce, as "[t]he process of marketing and supplying goods, esp. to retailers." *American Heritage Dictionary* 410–11 (2d College ed.1985). Using the statutory definition of "community" and the common meaning of the other statutory terms, we conclude a franchiser seeking to terminate a franchise under section 322A.11(2) must prove that transfer of ownership will cause considerable or material harm to the marketing and supplying of its vehicles in the area served by the franchisee.

Midwest Auto argues that the statutory language of section 322A.11(2) requires proof that the transfer will have an adverse impact on sales in the local community. It relies on the 2001 statutory definition of "substantially detrimental" to bolster its argument. The 2001 amendments to chapter 322A added the following paragraph to the definitional section of that chapter:

"Substantially detrimental" means that, by a preponderance of the evidence, the market share of the franchiser's motor vehicles in the community will be significantly reduced in comparison to the franchiser's historical market share in the community.

2001 Iowa Acts ch. 32, § 35 (codified at Iowa Code § 322A.1(10) (Supp.2001)).

We find it unnecessary to decide whether this amendment materially changed or merely clarified the meaning of "substantially detrimental" because the DOT's analysis of substantial detriment encompassed the elements of the legislative definition of this phrase. As Midwest Auto and amicus curiae assert, the import of the statutory definition is to focus the inquiry on whether the change in ownership will reduce the franchiser's sales in the community to any material degree. *See Webster's Third New International Dictionary* 2116 (defining "significant" as "having or likely to have influence or effect: deserving to be considered: IMPORTANT, WEIGHTY, NOTABLE"). As our subsequent discussion will illustrate, the DOT's finding of substantial detriment was based on the adverse impact a change in ownership would have on the sale of Jaguar vehicles and on Jaguar Cars' competitive advantage, not on an erroneous substitution of a "business judgment rule" in lieu of substantial detriment.

It is true, as Midwest Auto points out, that the ALJ stated, "CSI scores are a rational basis upon which Jaguar may deny the transfer of a Jaguar franchise." Notwithstanding this comment in the agency's discussion of the evidence, the ALJ ultimately ruled that Jaguar Cars had "carried its burden of proof, through the use of the 'gateway' criterion and the CSI scores, to establish that a Jaguar dealership operated by Midwest would be substantially detrimental to the distribution of Jaguar vehicles in the community." Thus, the DOT, which adopted the ALJ's findings and conclusions, did not merely conclude that Jaguar Cars made a reasonable business decision to rely on CSI scores; it also concluded that the CSI scores, in the context of the record in this case, established substantial detriment. Moreover, although the DOT did not specifically discuss whether the proposed transfer would adversely affect the sale of Jaguar vehicles in the Des Moines area, that is the clear import of the agency's analysis.

The evidence introduced at the hearing before the ALJ showed that Jaguar Cars' gateway criterion—above-average CSI scores—related directly to the marketing and sale of Jaguar vehicles. Jaguar Cars' witnesses testified that the company's gateway criterion for franchisees was designed to ensure that Jaguar Cars maintained or improved its competitive position in the automotive industry. Michael Dale, president of Jaguar Cars North America, testified Jaguar Cars believed its very existence depended on customer loyalty. He said that customer loyalty correlated with customer satisfaction. In other words, according to Dale, higher CSI ratings by consumers indicated greater loyalty to the Jaguar product. Moreover, as one Planet Automotive executive acknowledged at the hearing, luxury car customers "are the most demanding segment" with respect to customer service. Consequently, Jaguar Cars, in an attempt to increase customer satisfaction, has focused its efforts not only on improving product quality, but also on using only dealers who have high CSI scores. As Dale testified, in the experience of Jaguar Cars the quality of its dealers "could have a dramatic effect on the marketplace."

Based on this testimony, we think the gateway criterion upon which the DOT relied was clearly related to Jaguar Cars'

ability to sell its vehicles and maintain its market share. The agency's discussion of the *reasonableness* of the criterion did not indicate the agency had substituted a "business judgment rule" for the statutory standard. This discussion merely explained why the agency found the gateway criterion and the CSI scores credible.

In summary, the DOT did not apply a "business judgment rule" that simply permitted Jaguar Cars to implement its business philosophies without regard to their effect on the distribution of its product in Des Moines. Rather, as the ALJ's decision clearly reflects, the agency concluded the CSI scores submitted by Midwest Auto considered in the context of Jaguar Cars' market experience established the requisite substantial detriment. Therefore, we reject Midwest Auto's allegation that the agency employed an erroneous interpretation of section 322A.11(2).

V. *Was the DOT's Decision Based on Factual Findings That Are Not Supported by Substantial Evidence?*

■ A. *Standard of review.* Factual findings made by an agency that are supported by substantial evidence are binding "as are the reasonable inferences that may be fairly drawn from disputed evidence in the record." *George A. Hormel & Co. v. Jordan,* 569 N.W.2d 148, 151 (Iowa 1997). The 1998 amendments to chapter 17A provide the following statutory definition of the term "substantial evidence":

> *"Substantial evidence"* means the quantity and quality of evidence that would be deemed sufficient by a neutral, detached, and reasonable person, to establish the fact at issue when the consequences resulting from the establishment of that fact are understood to be serious and of great importance.

Iowa Code § 17A.19(10)(*f*)(1) (Supp.1999). In determining whether a factual finding is supported by substantial evidence, we view the record before the district court "as a whole." *Id.* § 17A.19(10)(*f*). To view the record "as a whole"

> the adequacy of the evidence in the record before the court to support a particular finding of fact must be judged in light of all the relevant evidence in the record cited by any party that detracts from that finding as well as all of the relevant evidence in the record cited by any party that supports it, including any determinations of veracity by the presiding officer who personally observed the demeanor of the witnesses and the agency's explanation of why the relevant evidence in the record supports its material findings of fact.

*Id.* § 17A.19(10)(*f*)(3). The ability to draw inconsistent conclusions from the evidence does not mean the agency's decision is not supported by substantial evidence. *Robbennolt v. Snap–On Tools Corp.,* 555 N.W.2d 229, 233 (Iowa 1996).

■ B. *Discussion.* Midwest Auto criticizes the agency's factual determinations in several particulars. Primarily, it faults the DOT for its reliance on the CSI scores, claiming the scores were not reliable or relevant. Midwest Auto also contends the agency failed to give sufficient consideration to other evidence in the record indicating that Midwest Auto's operation of the franchise would not and did not adversely affect customer satisfaction or sales.

We first address Midwest Auto's complaints concerning the reliability and relevancy of the CSI scores. As the DOT noted in its decision, customer satisfaction surveys are not an exact science. The evidence showed the automotive industry is in a continual process of revising and improving these surveys. Nonetheless, it

was also well documented in the record that the industry relies heavily on CSI scores and rankings in making business decisions. This information is used for purposes of dealer compensation and marketing; it is used to monitor and track dealer performance; and it is used to evaluate dealerships for purposes of acquisition and franchising. Midwest Auto's own witness acknowledged that this data was "the best available information [for] assessing the customer satisfaction or performance of a dealership." In fact, this witness testified, Planet Automotive uses CSI scores as "the principal factor" in gauging the customer satisfaction performance of dealerships it is interested in buying.

In considering the record as a whole, we have taken into account the testimony of Midwest Auto's expert witness who testified to technical and methodological deficiencies in customer satisfaction surveys. Despite these deficiencies, we agree with the DOT that the "CSI scores clearly are based upon an empirical inquiry [rather] than an anecdotal one." Moreover, given their widespread business use, we think they were sufficiently reliable to constitute "substantial evidence." *See* Iowa Code § 17A.19(10)(*f*)(1) (defining "substantial evidence" as "evidence that would be deemed sufficient by a neutral, detached, and reasonable person, to establish the fact at issue when the consequences resulting from the establishment of that fact are understood to be serious and of great importance"); *cf. In re Claremont Acquisition Corp.*, 186 B.R. 977, 986–87 (C.D.Cal. 1995) (relying on CSI scores to determine reasonableness of manufacturer's refusal to consent to assignment of franchise), *aff'd*, 113 F.3d 1029 (9th Cir.1997); *In re Van Ness Auto Plaza, Inc.*, 120 B.R. 545, 550 (Bankr.N.D.Cal.1990) (same). As the statutory definition of "substantial evi-

dence" reflects, scientific certainty is not required.

 We also reject Midwest Auto's assertion that the scores were not relevant. Midwest Auto attacks the relevancy of this evidence on two fronts: (1) there was no showing that the scores had any relationship to the distribution of Jaguar cars; and (2) the customer satisfaction performance of other Planet Automotive/Potamkin dealerships in other states did not indicate how the dealership in Des Moines would perform. We address each aspect of this argument separately.

We have already discussed the relationship between CSI scores and the sale of vehicles in connection with our analysis of the "substantially detrimental" requirement. To summarize this discussion, the evidence introduced by Jaguar Cars supports a conclusion that customer satisfaction impacts a dealer's ability to sell vehicles and that CSI data reflects the historical capability of a dealer to maintain customer satisfaction. Therefore, Jaguar Cars did show that the scores were relevant to the ultimate issue: whether the transfer of ownership would cause considerable or material harm to the sale of the franchiser's vehicles in the area served by the franchisee.

Interestingly, even the legislature has implicitly acknowledged the common-sense relationship between customer satisfaction and sales. In the preamble to the 1970 act, the general assembly "recognized that a significant factor of inducement in the making of a sale of a motor vehicle is the trust and confidence of the purchaser in the retail dealer from whom the purchase is made." 1970 Iowa Acts ch. 1160 Preamble. Thus, the ability to satisfy customers, as demonstrated by CSI data, is probative of the proposed franchisee's capability of selling vehicles.

We do not think the relevancy of this evidence was materially undermined by the fact the submitted CSI scores were those of Planet Automotive and Potamkin dealerships. Jaguar Cars' witness Dale testified that CSI scores reflect the overall culture of an organization. In addition, the record shows that none of the principals involved here—Planet Automotive, the Potamkins, and minority shareholder Ed Richardson—had prior Jaguar experience. Nor had any of these persons or entities operated a franchise in Iowa. Consequently, we agree with Jaguar Cars' assertion that any analysis of Midwest Auto's "qualifications necessarily had to draw upon its performance in other states, with franchises other than Jaguar."

Having concluded that the CSI scores were sufficiently relevant and reliable to constitute "substantial evidence," we now turn to Midwest Auto's other complaints with respect to the sufficiency of the evidence. Midwest Auto repeatedly criticizes Jaguar Cars for its focus on CSI scores in isolation. Midwest Auto argues that in determining whether it qualified for a Jaguar franchise, Jaguar Cars should have looked behind the CSI data to the overall performance of Planet Automotive/Potamkin dealerships and the qualifications and experience of Midwest Auto's owners and management. At the very least, argues Midwest Auto, Jaguar Cars should have met with Midwest Auto principals to discuss their qualifications.

We think these arguments are misdirected. The administrative process triggered by Jaguar Cars' application to terminate Midwest Auto's franchise was not intended to be a forum to evaluate the wisdom or even the fairness of Jaguar Cars' business practices. Whether Jaguar Cars could or should have accorded Midwest Auto a face-to-face meeting and considered factors other than CSI scores be-

fore filing its application is not germane to the real issue: whether Jaguar Cars proved at the administrative hearing that Midwest Auto's operation of the Des Moines franchise would be substantially detrimental to the distribution of Jaguar motor vehicles in this area.

Midwest Auto lodges similar complaints concerning the agency's consideration of the evidence. In particular, it asserts the agency improperly ignored evidence that (1) the submitted CSI scores showed that Planet Automotive/Potamkin customers were, on average, "satisfied" or "very satisfied"; (2) a ten percent margin of error should have been applied to the CSI scores to account for sampling errors and other measurement problems; and (3) CSI scores generated in the four months Midwest Auto operated the Des Moines Jaguar franchise before the hearing showed "completely satisfied" customers.

■ We do not think the fact that the CSI scores submitted by Midwest Auto's owners showed "satisfied" or "very satisfied" customers, as opposed to "dissatisfied" customers, undermines the DOT's holding that Jaguar Cars had proved substantial detriment. The evidence showed that, in the luxury vehicle market, complete satisfaction of customers was essential to maintaining a competitive advantage. A review of the record reveals that on average, no customer base of even one Jaguar dealer in the United States was less than "very satisfied," and in over eighty percent of the franchises, the customers were "completely satisfied." Midwest Auto's failure to meet this threshold requirement was critical according to Jaguar Cars' witnesses because the degree of customer loyalty differed dramatically between customers who were completely satisfied and those who were only very satisfied or satisfied. Consequently, the fact that Planet Automotive/Potamkin custom-

ers were generally satisfied or very satisfied illustrated that the same level of service in the Des Moines franchise would be detrimental to Midwest Auto's ability to sell Jaguar vehicles, thereby diminishing Jaguar Cars' market share in the community.

■ We also have no concern about the DOT's failure to apply a margin of error to the CSI scores. According to Midwest Auto's expert witness, a ten-percent margin of error should have been applied and if that had been done, Midwest Auto would have met the gateway criterion of above-average CSI scores. The expert's credibility on this issue was, however, substantially undermined by his admission that a *ten-percent* margin of error was not based on any particular analysis of the degree of likely sampling or other errors, but only his experience. (A smaller margin of error would not have boosted Midwest Auto's CSI scores into the "above-average" category.) In addition, there was evidence that this expert had relied on CSI scores to support his testimony with respect to dealer performance in two other cases, without any mention of the need to inject a margin of error into the analysis. Finally, we note that the CSI scores were not used here to establish an absolute level of customer service, but were only used on a comparative basis to establish that the submitted scores were either above or below average. Thus, any surveying errors that would call for application of a margin of error would presumably be equally present in the scores to which Midwest Auto was being compared, rendering the use or nonuse of a margin of error inconsequential.

■ The last matter to be addressed is the agency's failure to give predominate importance to Midwest Auto's CSI scores since it took over the Ostrem Imports dealership.[2] At the agency hearing, Midwest Auto submitted evidence that in three of the four months it operated the Des Moines Jaguar franchise its CSI scores were above Jaguar Cars' national average. Midwest Auto argues that its actual performance more than outweighed its prior CSI scores in other dealerships for other make-lines.

We note initially that the record casts some doubt on the validity of these post-litigation scores as a predictor of long-term performance. Shareholder Richardson, who managed the Des Moines dealership, testified that he was intent on getting perfect CSI scores, in part due to the pendency of this litigation. He admitted using various strategies to satisfy customers, including taking a part off a new Jaguar in order to quickly repair a customer's car, giving gift certificates to customers who were not otherwise entirely happy, and hiring a customer service director for all four lines sold by the dealership. Under these circumstances we do not think the agency was required to ignore the historical evidence of below-average performance in favor of four months of above-average performance.

2. Midwest Auto also makes a passing reference to *district court* error in failing to allow Midwest Auto to introduce into evidence on judicial review CSI scores from Midwest Auto's operation of the Des Moines dealership since the administrative hearing. Other than to cite the statutory authority that would permit the court to take additional evidence, Iowa Code § 17A.19(7), Midwest Auto offers no further analysis, argument, or authority for its claim of error. We find this random assertion of error insufficient to preserve the issue for appellate review. *See Soo Line R.R. v. Iowa Dep't of Transp.*, 521 N.W.2d 685, 689 (Iowa 1994) (random mention of issue, without elaboration or supporting authority, is insufficient to raise issue for Supreme Court's consideration); *accord State v. Mann*, 602 N.W.2d 785, 788 n. 1 (Iowa 1999).

In conclusion, we hold there was substantial evidence to support the DOT's factual finding that the transfer of the Jaguar franchise to Midwest Auto would be substantially detrimental to the distribution of Jaguar products in this area.

## VI. *Was the DOT's Decision Inconsistent with its Prior Precedents?*

██ Midwest Auto also asserts the DOT's decision in this case was inconsistent with the agency's prior precedents that employed a multi-factored analysis in a transfer-of-ownership situation. In *Clement Auto & Truck, Inc. v. General Motors Corp.*, No. FC 32 (Iowa Dep't of Transp.1984), the DOT held that a manufacturer's process of "blueprinting"—a market analysis to determine whether a dealership should continue—was "reasonable" and showed "that projected sales levels would be adversely affected" by transfer of the franchise to the proposed new dealer. Despite the DOT's acknowledgement that blueprinting had "an element of speculation . . . as it [was] nothing but a projection," the agency gave this evidence "considerable probative value" and held the manufacturer had "established 'substantial detriment' to the distribution of its product if the transfer could be effectuated."

The DOT's decision in the present case is entirely consistent with its decision in *Clement Auto*. Here, as in *Clement Auto*, the agency relied on admittedly predictive evidence indicating the transfer would adversely affect sales, thereby resulting in substantial detriment to the distribution of Jaguar vehicles. Although the agency in *Clement Auto* also discussed the "public interest" as "another factor" that supported its decision, it gave no indication that a multi-factored analysis was required. In fact, the agency's entire discussion of "substantial detriment" was dicta, given its determination that the franchise had been voluntarily terminated by the original owner of the dealership prior to the sale of the dealership. Thus, as the DOT itself noted in its *Clement Auto* decision, "it [was] not necessary to determine if the attempted transfer [would] be 'substantially detrimental' to the distribution of [the franchiser's] vehicles in the [community]."

Even if the agency applied a multi-factor test in *Clement Auto*, Midwest Auto has waived any error in the agency's failure to do so here. At the commencement of the administrative hearing, the attorney representing Midwest Auto addressed the applicable legal principles, referring to the test set forth in section 322A.11(2) as the "transfer standard" and the multi-factored test of section 322A.15 as the "good cause standard." Referring to the fact that since the filing of Jaguar Cars' application the dealership had been sold, counsel for Midwest Auto stated,

> I think both sides are suggesting to Your Honor that the case has migrated factually and legally because in fact we are faced with a dealership with its new owners operating and that *the transfer standard applies here. If* the good cause standard did apply, and we have briefed this . . . Your Honor, we think the result would be the same. . . .

(Emphasis added.) As noted by the DOT in its brief, Midwest Auto's "current argument that the 'good cause' standard of section 322A.15 trumps the transfer standard of [section] 322A.11(2) . . . contradict[s] its own previously expressed contention." Therefore, error, if any, in the DOT's failure to apply a multi-factor test without distinguishing *Clement Auto* was waived.

## VII. *Conclusion.*

The DOT did not apply an erroneous interpretation of chapter 322A. In addition,

its factual findings were supported by substantial evidence when the record is viewed as a whole. Finally, the agency's decision was not inconsistent with its prior precedents and, to the extent it was, any error was waived. For these reasons, we find no error warranting reversal.

**AFFIRMED.**

All justices concur except CADY, J. who dissents and LAVORATO, C.J., and STREIT, J., who take no part.

CADY, Justice, dissenting.

I respectfully dissent.

Section 322A.11 exists to protect the franchiser, franchisee, and the consumer. *See* Comment, *Public Interest and the Iowa Motor Vehicle Franchisers Act,* 56 Iowa L.Rev. 1060, 1060–61 (1971). The majority, however, has interpreted the statute to primarily protect motor vehicle companies and franchisers.

Section 322A.11(2) makes it clear that change in ownership of a franchise may not constitute good cause for the termination of the franchise unless the change in ownership "will be substantially detrimental to the distribution of franchiser's motor vehicles in the community." Iowa Code § 322A.11(2). This is a very broad standard based on the adverse impact of the change in ownership on the *distribution* of vehicles in the *community* served by the franchise.

In my mind, this standard requires a broad inquiry to properly consider the diverse interests that necessarily accompany a decision to terminate a franchise. These interests are not solely confined to the manufacturer, but include the franchisee as well as the local consumer. By permitting the standard to be satisfied by a single threshold standard utilized by the manufacturer—consumer satisfaction ratings—the majority has narrowed this

broad legislative standard to protect only the interests of the manufacturer and has permitted corporate decision-making geared towards the purpose of making a profit to trump other considerations geared toward the interests of consumers and local franchisees. As a matter of law, I would conclude the single reason offered by the franchiser in this case to terminate the franchise was insufficient.