**Douglas E. DAWSON, Appellant,**

v.

**IOWA BOARD OF MEDICAL EXAMINERS, Appellee.**

No. 01–1201.

Supreme Court of Iowa.

Dec. 18, 2002.

Davis L. Foster, Iowa City, for appellant.

Thomas J. Miller, Attorney General, and Heather L. Adams and Theresa O'Connell Weeg, Assistant Attorneys General, for appellee.

TERNUS, Justice.

The appellant, Douglas E. Dawson, appeals a district court decision on judicial review affirming the order of the appellee, Iowa Board of Medical Examiners, reinstating Dawson's medical license subject to certain competency-based conditions. Dawson claims he did not agree to the imposition of competency-based conditions when he entered into a settlement agreement with the Board to resolve the underlying disciplinary proceeding brought by the Board against him. He also challenges the power of the Board to impose competency-based conditions when it made no finding of incompetency in the original disciplinary proceeding. The absence of such a finding and the lack of any other factual support for such conditions, argues Dawson, render the Board's order arbitrary, capricious and an abuse of discretion. Finding no merit in these contentions, we affirm.

I. *Background Facts and Proceedings.*

The Iowa Board of Medical Examiners is the state agency responsible for the examination, licensing, and discipline of physicians practicing medicine in the State of Iowa. *See generally* Iowa Code chs. 147,

148, 150A, 272C (1999 & Supp.1999). Dawson is a board-certified otolaryngologist who has been licensed to practice medicine in Iowa since 1984.

On December 16, 1999, the Board filed formal disciplinary charges against Dawson that included two primary allegations: (1) professional incompetency; and (2) unethical conduct based on Dawson's sexual relationship with a patient. The Board's allegations of professional incompetency involved Dawson's treatment of some eighty-two patients. A peer review committee formed by the Board to review a sampling of these cases concluded Dawson failed to meet the prevailing standard of care in several particulars. Among other items, the committee found Dawson failed to document the medical necessity for the surgeries he performed, and he employed the same excessive bilateral sinus surgery regardless of the level of disease present. In addition, the committee concluded Dawson excessively or unnecessarily removed the middle and inferior turbinates in all thirteen sinus cases reviewed, resulting in chronic debilitating symptoms that were not present prior to surgery. Because the Board believed Dawson's continued practice posed an immediate danger to the public's health, safety, and welfare, it issued an emergency order indefinitely suspending Dawson's medical license pending a hearing. *See generally id.* § 17A.18A (allowing agency to "use emergency adjudicative proceedings in a situation involving an immediate danger to the public health, safety, or welfare").

On February 10, 2000, prior to the scheduled hearing on the Board's charges, Dawson and the Board entered into a "settlement agreement and final order to resolve the [pending disciplinary proceeding]." *See generally id.* § 272C.3(4) (providing for informal stipulation and settlement agreements by a board and a licensee of any matter involving licensee discipline). The agreement stated in pertinent part that Dawson admitted the allegations of sexual misconduct, but contested the allegations of professional incompetency. It further stated the Board made "no finding with respect to the allegations" of professional incompetency. The parties agreed that Dawson's license would be indefinitely suspended, but that he could apply for reinstatement after satisfying specific requirements set out in the agreement. These requirements included Dawson's submission to a comprehensive evaluation at the Colorado Physician's Education Program (CPEP) in Denver, Colorado, and a comprehensive sexual misconduct evaluation at the Behavioral Medicine Institute (BMI) in Atlanta, Georgia. In addition, Dawson agreed to provide the Board with reports from CPEP and BMI following their evaluations. Finally, Dawson specifically agreed "to comply with any recommendations made by CPEP ... [and] BMI."

In addition to these requirements, Dawson's future reinstatement was also made subject to Iowa Administrative Code rule 653—12.40, which provides that "[a]ny person whose license to practice medicine and surgery ... has been revoked, or suspended by the board, may apply to the board for reinstatement *in accordance with the terms and conditions of the order of revocation or suspension.*" (Emphasis added.) More specifically, the settlement agreement provided that "the Board [had] the discretion to impose a period of probation with appropriate terms, and *to impose those restrictions on [Dawson's] practice which it deems appropriate.*" (Emphasis added.) And finally, Dawson agreed to "voluntarily waive[ ] any rights to a contested case hearing on the allegations ... and waive[ ] any objections to the terms of [the] Settlement Agreement."

In April 2000, Dawson applied for reinstatement of his license. At the reinstatement hearing, he presented evidence that he had completed both required evaluations and he submitted reports of both assessments.

The CPEP report stated that it assessed "educational status and clinical competencies." It indicated three board-certified otolaryngologists had interviewed Dawson with respect to actual patient cases he had handled. In addition, the evaluation included a multiple-choice assessment to reveal areas of concern and simulate patient encounters, a psychological indicator test, and a screening for cognitive impairment. The report summarized the consultants' assessment of Dawson's clinical judgment as follows:

In the area of *clinical judgment,* Dr. Dawson demonstrated the ability to make good decisions. For example, he managed jaw surgery, parotid tumor, peritonsillar cellulitis, sleep apnea and tonsillectomy well. In one case he helped the patient achieve weight loss rather than perform surgery; in another he corrected a nasal problem and did not do sinus surgery. *However, each consultant noted his aggressive approach to sinus disease.* The consultants commented on the different philosophies of sinus surgery and recognized that authorities in this area do differ regarding the extent of surgery that should be performed. The more aggressive approach may lead to difficult complications and *the consultants recommended that Dr. Dawson be more conservative in his choices.*

(Final two emphases added.) At the end of the report was a section entitled "Implications for Education and Other Intervention." Consistent with the consultants' concern regarding Dawson's use of extensive surgery in the management of chronic sinusitis, the suggestions for modification also focused on this area:

During this Assessment, Dr. Dawson demonstrated a sufficient level of clinical competence to continue to practice unsupervised. From an educational perspective it would be reasonable for Dr. Dawson to review the self-instructional material available at the American Academy of Otolaryngology/Head and Neck Surgery. Additionally, universities and other institutions offer *sinus surgery* courses. These courses and educational material may provide *alternatives to Dr. Dawson's current approach to sinus disease.* Participation in regular discussions with colleagues about *surgery decisions* (an academic-style morbidity and mortality conference) is especially important for physicians in solo practice. Service on a hospital quality improvement committee is another way to keep abreast of changes in *surgical management.* Tracking aggregate data (number of patients seen, disease, procedures, complications and outcomes) helps a physician continue to offer quality patient care and can identify when consideration of a *change in management style* needs to occur. Based on this evaluation, the Medical Education Director did not suggest a formal, structured, supervised Education Plan.

(Emphasis added.)

In response to the reports from CPEP and BMI, the State proposed a reinstatement order that placed Dawson on probation for five years. In addition to certain conditions designed to address Dawson's sexual improprieties, the proposal required that before he resumed endoscopic surgery, he had to submit for board approval a document explaining the benefits, risks, potential complications, and expected postoperative course of endoscopic sinus surgery. In addition, the State wanted the

Board to require Dawson to submit a written surgical consent form for Board approval. The proposed order also mandated performance monitoring by a board-certified otolaryngologist of any endoscopic sinus surgery undertaken by Dawson, including an evaluation of the preoperative indications for surgery by the monitoring physician. The State requested that Dawson be required to comply with any recommendations of the monitoring physician, including a recommendation that surgery not be performed.

Subsequently, the Board issued a decision that included findings of fact consistent with the above recitation of the factual background of this case. The Board concluded that Dawson had complied with the terms of the settlement agreement and final order and that his license should be reinstated "subject to certain terms and conditions." The Board rejected the State's request for professional monitoring, but did require Dawson to submit for the Board's approval "a written quality improvement plan to address concerns raised in the CPEP report about his aggressiveness in diagnosing and treating sinus disorders." This plan had to include (1) "a written explanation of risks/benefits of endoscopic surgery to be provided to patients," (2) a "written procedure for obtaining informed consent," (3) a "method for collecting and tracking aggregate data on the number of patients seen, disease, procedures, complications, and outcome," and (4) a "continuing medical education program." Once the plan was approved, Dawson's license would be reinstated. The order provided, however, that Dawson would be on probation for five years, and the continuation of his license would be subject to certain requirements that included full compliance with the quality improvement plan approved by the Board.

After the Board issued its ruling, Dawson submitted a written quality improvement plan that was accepted by the Board after a few modifications made at the Board's request. Upon approval of the plan, the Board issued a final order on September 8, 2000, reinstating Dawson's license subject to the terms of its prior decision and order.

Dawson sought judicial review, challenging the Board's requirement that he comply with the quality improvement plan as a condition of his probation. The district court affirmed. The matter is now before this court on appeal from the district court.

II. *Scope of Review.*

■ Relief from agency action may be accorded by the court when a party's "substantial rights have been prejudiced because the agency's action meets any one of several statutory criteria." *Midwest Auto. III, LLC v. Iowa Dep't of Transp.*, 646 N.W.2d 417, 421 (Iowa 2002) (citing Iowa Code § 17A.19(10) (Supp.1999)). The criteria implicated here include agency action "[b]ased upon a determination of fact ... that is not supported by substantial evidence in the record before the court when that record is viewed as a whole" and agency action that is "[o]therwise unreasonable, arbitrary, ... or an abuse of discretion." Iowa Code § 17A.19(10)(*f*), (*n*).

Evidence is substantial when "a neutral, detached, and reasonable person" would find it sufficient "to establish the fact at issue when the consequences resulting from the establishment of that fact are understood to be serious and of great importance." *Id.* § 17A.19(10)(*f*)(1). In deciding whether a finding is supported by substantial evidence in the record, we consider the evidence that detracts from the challenged finding as well as the evidence that supports it. *Id.* § 17A.19(10)(*f*)(3).

■ An agency action is arbitrary "when it is taken without regard to the law

or facts of the case." *Soo Line R.R. v. Iowa Dep't of Transp.*, 521 N.W.2d 685, 688–89 (Iowa 1994). Similarly, a decision is unreasonable when it is "clearly against reason and evidence." *Stephenson v. Furnas Elec. Co.*, 522 N.W.2d 828, 831 (Iowa 1994). An "abuse of discretion is synonymous with unreasonableness." *Id.*

### III. *Issues on Appeal.*

Initially, Dawson challenges the Board's ability to impose competency-based conditions on his reinstatement in the absence of any competency-based findings in the underlying disciplinary proceeding. Specifically, he claims that in the absence of such findings the Board's conditions are unjustified and without factual support in the record. Under these circumstances, argues Dawson, the Board's action and decision are arbitrary, unreasonable, and an abuse of discretion. Finally, Dawson asserts the CPEP assessment provides no basis for the imposition of the competency-based restrictions contained in the Board's reinstatement order.

The Board disputes that its competency-based conditions lack substantial support in the record and claims that it was entitled to impose such conditions pursuant to the parties' settlement agreement. It asserts Dawson consented to the imposition of competency-based restrictions by entering into that agreement.

When the arguments of the parties are considered in relation to the standards of review under chapter 17A, it appears the issues boil down to two. First, may the Board impose competency-based restrictions when it has not made a prior finding of incompetency but the physician has consented to a final order including the terms found in the agreement at issue in this case? Second, is there a factual basis in the record for the imposition of competency-based restrictions?

### IV. *Power of Board to Impose Competency–Based Restrictions When It Has Not Made a Prior Finding of Incompetency Because the Disciplinary Proceeding Was Resolved by Settlement.*

■ A professional licensing board is not required "to make specific findings to support ... conditions of probation." *Burns v. Bd. of Nursing*, 528 N.W.2d 602, 605 (Iowa 1995). Nonetheless, we think a condition imposed upon reinstatement of a medical license that is not related in some logical and rational way to the matters that led to the initial suspension would be arbitrary.

■ Here, there is no dispute the Board did not make a factual finding in the contested case proceeding that Dawson rendered incompetent treatment to his patients. On the other hand, there is no dispute that the restrictions challenged by Dawson address competency concerns. Dawson would have our examination of the record end here, but we think the settlement agreement is an important component of our consideration of this issue.

Although no finding or admission of incompetency was included in the parties' settlement agreement, Dawson agreed to subject himself to an evaluation at CPEP. There can be no doubt this evaluation was focused on competency matters. In addition, Dawson agreed that any subsequent reinstatement of his license would be subject to his full compliance with the requirements set forth in the settlement agreement as well as any conditions the Board deemed appropriate. One of the express requirements contained in the settlement agreement was that he comply with any recommendations of CPEP, which obviously would be related to competency issues.

For Dawson to now claim that he did not anticipate any competency-based re-

strictions or conditions upon his reinstatement is simply not supported by the record. To the contrary, we conclude he consented to conditions of the very type imposed by the Board in its reinstatement order. Furthermore, any objections to the terms of the settlement agreement at this time will not be considered, as Dawson expressly waived the right to object to the settlement terms as part of the agreement he reached with the Board.

■ In summary, we do not think a Board finding of incompetency or a physician admission of incompetency is required before the Board may condition reinstatement on competency-related restrictions when the physician, as here, has agreed as part of the settlement of the Board's disciplinary charges to terms and conditions that address the Board's competency concerns. To require such findings or admissions would discourage informal settlements of disciplinary proceedings contrary to legislative intent that such settlements be encouraged. *See* Iowa Code § 17A.10(1) ("Unless precluded by statute, informal settlements of controversies that may culminate in contested case proceedings according to the provisions of this chapter are encouraged."). For example, one advantage to a physician of a settlement is the avoidance of an evidentiary hearing and possible adverse findings. The Board, however, would have no incentive to enter into informal settlements if doing so would preclude it from addressing the concerns that led to the filing of the disciplinary proceeding. We conclude, therefore, that the Board could impose competency-based conditions on Dawson's reinstatement.

V. *Factual Basis For The Imposition of Competency–Based Restrictions In This Case.*

■ Dawson claims that even if a finding or admission of incompetency is not a prerequisite to the imposition of competency-based conditions on reinstatement, the Board's decision to include such conditions in Dawson's five-year probation is unreasonable and arbitrary. He asserts this is so because the CPEP did not recommend such restrictions and there is no other factual basis in the record to justify them.

■ We first point out that the Board, as a professional licensing authority, has discretion "to determine what conditions should be attached to probation," and this court will not second-guess the Board's judgment in this regard absent an abuse of that discretion. *Burns,* 528 N.W.2d at 604–05. Upon our review of the record, we conclude the Board's decision to order Dawson to submit and comply with a written quality improvement plan is not "against reason and [the] evidence." *Stephenson,* 522 N.W.2d at 831.

Contrary to Dawson's contention, the restrictions imposed by the Board find substantial support in the report from CPEP. Granted, CPEP pointed out positive aspects of Dawson's professional skills, but it also noted Dawson's aggressive approach to sinus surgery. Significantly, "the [CPEP] consultants recommended that Dr. Dawson be more conservative in his choices." We reject Dawson's assertion that the concern over his surgical decisions was merely a reflection of different approaches to treatment of sinus disease. The consultants acknowledged the existence of this professional debate but even within this context viewed Dawson's handling of sinus patients as too aggressive.

In addition, while CPEP diplomatically discussed "[i]mplications" for "intervention," these "implications" were, we think, intended as suggestions for ways in which Dawson's enthusiastic use of surgery

might be tempered. *See generally* Webster's Third New International Dictionary 1135 (unabr. ed.1993) (defining "implication" in part as "suggestion"); *id.* at 1183 (defining "intervene" as "to come in or between by way of hindrance or modification"). We disagree with Dawson's characterization of these recommendations as merely "general observations ... applicable to all physicians," and his claim they were not "directed at ... [him] specifically." In discussing these "implications for intervention," CPEP references ways in which Dawson might become aware of "alternatives to [his] current approach to sinus disease," of "changes in surgical management," and of "when consideration of a change in management style needs to occur." It is not a coincidence that these suggestions would assist Dawson in making more conservative choices in his treatment of sinus disease, as recommended by the CPEP consultants.

A review of the Board's reinstatement order shows that the Board merely worked off the suggestions made in the CPEP report to devise a probation plan that would encourage Dawson to assess the wisdom of his aggressive approach by tracking patient disease, procedures, complications, and outcome. The fact that the Board's order included conditions in addition to those contained in the CPEP report is not unreasonable, as the Board was entitled to use its professional judgment in devising an appropriate probation plan that addressed the competency concerns for which Dawson was evaluated. These additional conditions—preparation of an informed consent form and a plan for obtaining informed consent—reflect an effort by the Board to force Dawson as well as his patients to focus on the risks and benefits of sinus surgery before embarking on that treatment approach. Moreover, they are consistent with the CPEP recommendation that Dawson consider alternatives to his aggressive use of surgery.

We find no merit in Dawson's complaint that the Board's reinstatement requirements were at odds with CPEP's conclusion that "a formal, structured, supervised [e]ducation [p]lan" was not necessary. By its own terms, the CPEP report assessed "educational status *and* clinical competencies." (Emphasis added.) The quality improvement plan required by the Board was, according to the Board's order, intended "to address concerns raised in the CPEP report about [Dawson's] aggressiveness in diagnosing and treating sinus disorders." In other words, the quality improvement plan was directed at Dawson's clinical competency, not his educational status. Although the plan was to include a continuing education program, the order did not require that any such program be formal or supervised.

In summary, we think the conditions imposed on Dawson's probationary reinstatement by the Board are very reasonable and well supported by the record. Accordingly, we find no basis to overturn the Board's decision.

**AFFIRMED.**