WAL–MART STORES, INC., Appellee,

v.

Richard CASELMAN, Appellant.

No. 01–0704.

Supreme Court of Iowa.

Feb. 26, 2003.

Paul J. McAndrew, Jr., Coralville, for appellant.

Chad M. Vonkampen of Simmons, Perrine, Albright & Ellwood, P.L.C., Cedar Rapids, for appellee.

NEUMAN, Justice.

This appeal challenges the decision rendered on judicial review of an administrative proceeding for workers' compensation benefits. The district court disagreed with the compensation commissioner's factual findings regarding the extent of the workers' disability as well as the commissioner's conclusions regarding its award of penalty benefits. The question on appeal is whether the district court applied the proper standard of review and whether the record, properly reviewed, supports the commissioner's decision.

In keeping with Iowa Code section 17A.19(10)(f) (Supp.1999), we have examined the "record before the court ... viewed as a whole." Based on our review, we believe that substantial evidence supports the commissioner's findings and award. We therefore reverse the district court's contrary decision and remand for entry of an order affirming the agency.

## I. Background.

Rick Caselman has been a truck driver for Wal–Mart Stores, Inc., since October 1991. He injured his back in August 1997 while unloading merchandise at a Wal–Mart store in Shenandoah, Iowa. The injury occurred while Caselman was muscling a 130–pound docking plate into place. Conservative treatment using bed rest and anti-inflammatory medications provided only partial relief. An MRI revealed a

herniated disc at the L5–S1 level. In October 1997, Caselman underwent surgery for a laminectomy and discectomy. Although the surgery was reportedly successful, continuing back and leg pain has impaired Caselman's ability to return to his former employment with Wal–Mart. The extent of his impairment is the fighting issue on this appeal.

The parties agree that Caselman's work injury caused some degree of industrial disability. Our factual focus, therefore, must be on the extent of his loss of earning capacity. *Thilges v. Snap–On Tools Corp.*, 528 N.W.2d 614, 616 (Iowa 1995); *Guyton v. Irving Jensen Co.*, 373 N.W.2d 101, 103 (Iowa 1985). As this court said in *Guyton,*

> [b]odily impairment is merely one factor in gauging industrial disability. Other factors include the worker's age, intelligence, education, qualifications, experience, and the effect of the injury on the worker's ability to obtain suitable work. When the combination of factors precludes the worker from obtaining regular employment to earn a living, the worker with only a partial functional disability has a total industrial disability.

*Guyton,* 373 N.W.2d at 103 (citations omitted); *accord IBP, Inc. v. Al–Gharib,* 604 N.W.2d 621, 632–33 (Iowa 2000).

With these principles in mind, we turn to the record made before the agency.

**A. Facts.** Caselman was forty-three years old at the time of the hearing. He is a high school graduate but academics have never been his strong suit. He graduated thirty-fifth out of a class of thirty-eight. All of his adult employment has involved unskilled manual labor, most of it physically demanding. He has worked over twenty years as a truck driver, including a two-year period when he owned his own rig. As a younger man he held a number of minimum-wage jobs including grounds maintenance, pizza cook, and service station attendant.

For roughly a year following his hiring by Wal–Mart in 1991, Caselman hauled freight out of the company's terminal in Mt. Pleasant, Iowa. He then drove a Wal–Mart moving van for several years, loading, transporting, and unloading household furnishings for company executives and managers who had been transferred to new locations. During 1995 he resumed freight-hauling out of the company's terminal in Ottawa, Kansas, until, in August 1995, he began driving "claims" runs. This assignment, which involved picking up returned merchandise from a variety of Wal–Mart stores, continued until August 1997 when the injury occurred which is the focus of this appeal.

By all accounts, Caselman has been a valued Wal–Mart employee. Yearly written evaluations based on customer service, safety, team participation, technical skills and driver traits routinely rank him in the "highly effective" category. The general transportation manager at the company's Ottawa terminal described him as a "good driver" with a "very good work record." Evidently a strong and relatively healthy person before his work-related injury, Caselman's work history reveals that he took only one day of sick leave in all his prior years with Wal–Mart. He has been financially rewarded for his hard work, earning nearly $90,000 in gross wages during the year before he injured his back.

Post-surgery is another story. Caselman returned to work at Wal–Mart on December 1, 1997 doing light work at the distribution center. By late January 1998 his surgeon, Dr. Parkins, authorized his return to driving, with a limitation in hours behind the wheel and a weight-lifting restriction. That worked well. Accustomed to working ten-hour days, Caselman drove out and back for a total of six hours on the

road (with breaks), finishing up the day with four hours in the office or guard shack. In mid-February, Dr. Parkins released Caselman without restrictions. He resumed full duty, able to secure runs that put him on the road only five hours each way. That changed in early March. Caselman was dispatched on a long run, seven hours in one direction, and the pain in his back and leg returned. He was unable to sleep due to the pain. Despite his protest, Wal–Mart continued to dispatch Caselman on long runs. He was told that giving him shorter runs would show unacceptable "favoritism." His pain worsened over the month and his right leg began cramping and falling asleep. On March 31, as he was driving into Kansas City from St. Louis, his leg went to sleep and he "could not control it." He parked his truck, notified Wal–Mart and was relieved of his duty. He has not worked since that day.

Shortly after the incident in Kansas City, Caselman was examined by a Wal–Mart physician, Dr. David Edalati. The doctor's report recounted Caselman's leg numbness, and directed that unless Caselman could be limited to four-hour drives he should be taken off work for one week. He also ordered an examination by Caselman's orthopedic surgeon. Within the week, Caselman was examined by the surgeon, Dr. Parkins. The doctor reported that Caselman "generally does well … when he does not have to drive more than three hours in one direction for a total of 6 hours per day." He entered a work restriction consistent with that finding.

When Caselman returned to Wal–Mart he was told that its policy had changed and he could not return to work unless he could perform 100 percent. He was encouraged to quit and take long-term disability. A memo in Wal–Mart's file reveals a request that Dr. Parkins consider cutting back on his restriction, thereby permitting Caselman to "drive 4 hours, rest, then drive 4 more hours." The memo goes on to state that "Wal–Mart will accommodate light duty for one month" but if the restrictions are permanent "then we will need to do a rating. Even though long hauls are not done much he still has to be able to drive for 8 hrs." A few days later, Dr. Parkins re-examined Caselman, and amended his restrictions accordingly. In October 1998, Dr. Parkins reported that Caselman had reached maximum medical improvement (MMI) and gave him a permanent partial impairment rating of "12% of the body as a whole."

At Wal–Mart's request, Caselman also received an independent medical evaluation of his back injury by Dr. David Clymer. His report essentially mirrored Dr. Parkin's findings and recommendation with respect to MMI, impairment rating and restrictions—driving limited to four hours each way with a rest period, a thirty-pound weight-lifting restriction, and a twelve percent permanent impairment of the whole body. His report, however, tended to emphasize the subjective nature of Caselman's low back discomfort and leg pain, speculating it is probably related to "some ongoing nerve irritation due to fibrosis at the site of the disc and previous surgical exploration."

Dr. Keith Riggins performed an independent medical evaluation at Caselman's request. An orthopedic surgeon who retired due to his own physical disability, Dr. Riggins is a fellow of three separate academies: Orthopedic Surgeons, Disability Evaluating Physicians and Occupational and Environmental Medicine. On examining Caselman, he noted certain self-limitation or "variability" in Caselman's range of motion which he suspected was due to segmental instability in the spine. That suspicion was not born out by later x-rays.

Dr. Riggins nevertheless described Caselman as

compromised in his ability to engage in activities which require:

-repetitive or persistent forward flexion of the trunk or placing the trunk in ungainly positions.

-lifting weights greater than 20 lbs. maximum.

-lifting weights greater than 10 lbs. on a frequent basis.

Weights lifted should be confined to the interval between knee and shoulder, not picked up from the floor and not placed above shoulder level.

Dr. Riggins gave Caselman an impairment rating of eleven percent "of the whole person."

Two vocational rehabilitation specialists offered their assessments of Caselman's vocational options. Dan Zumalt, selected by Wal–Mart, reported that Caselman was most highly motivated to return to his former job as a truck driver with Wal–Mart. Zumalt recognized, however, that Caselman's work restrictions likely prevented his return there. Zumalt did not believe Caselman was suited, intellectually or physically, for other types of work. So Zumalt explored thirty other truck driving opportunities in the region. He concluded that twenty-one (70%) would not accommodate the driving time and weight limitations imposed by Caselman's physicians. Based on the remaining seven companies he contacted, Zumalt estimated that Caselman could "return to the open labor market and earn $33,000 annually plus benefits (average $11.40/hr @ 50 hrs/wk)." He made no attempt, however, to secure any of those positions for Caselman.

Barbara Laughlin, a vocational rehabilitation consultant hired by Caselman, noted that Zumalt did not include Dr. Riggins' restrictions when contacting the seven trucking companies upon whose assessment of employability he relied. She made those calls and learned that none of them would accommodate Caselman's restrictions. In her view, both the salary and work-hour capacities projected by Zumalt were unrealistic. The great distance from Caselman's home to any major metropolitan area limits his access to diverse nonskilled labor positions. Lighter, sedentary work involving clerical/computer skills exceed Caselman's training and, realistically, his intellectual abilities or interest. She reported that Caselman is highly motivated to return to his job at Wal–Mart, with necessary restrictions, but her conversations with Wal–Mart officials led her to believe "they would not be able to hire him." She concluded, ultimately, that Caselman "has suffered a loss of access to the labor market of approximately 100%."

Caselman's wife and son also testified regarding the impact of his back injury on his daily activities. Once active and fun-loving, Caselman is now chronically tired and grouchy. He neither drinks nor smokes. Because pain disrupts his sleep, he and his wife no longer share the same bed, nor have they enjoyed normal sexual relations since his injury. Caselman had been an avid outdoorsman, for years devoting his time off the road to long hunting trips with his sons. Although he bought a hunting license in 1998, the season lasted only two hours for him. He reportedly could not endure the pain in his back and leg. With effort he does the family grocery shopping and yard work at a slow pace, activities which necessitate spending much of the rest of the day recovering on his back.

Further facts will be detailed as they relate to the issues on appeal.

**B. Legal proceedings.** Based on the record sketched above, the deputy workers' compensation commissioner found Ca-

selman "suffered a 100 percent loss of his earning capacity as a result of the work injury" and, accordingly, found him entitled to permanent total disability benefits under Iowa Code section 85.34(3) (1999) "for the duration of his disability." The deputy also found that Wal–Mart mistakenly paid Caselman benefits based on Kansas law, rather than Iowa law, and did not repay the difference until months after the error was discovered. Evidently consistent with a pattern repeated in other cases, on a minimum of ten occasions Wal–Mart paid Caselman's benefit checks from four to eighteen days late. These unexplained delays prompted the deputy to award penalty benefits of $8000.

The deputy's decision was affirmed on intra-agency appeal. On Wal–Mart's subsequent petition for judicial review pursuant to Iowa Code chapter 17A, the district court adopted nearly verbatim Wal–Mart's brief, reversing the agency decision. This appeal by Caselman followed.

## II. Scope of Review.

▮ Our review under Iowa Code chapter 17A is for correction of errors at law, not de novo. *Locate.Plus.Com, Inc. v. Iowa Dep't of Transp.*, 650 N.W.2d 609, 612 (Iowa 2002). At the outset, however, the parties disagree about the nature of that review. Chapter 17A was amended in 1998, with amendments "effective for agency action commenced after July 1, 1999." *Id.; see* 1998 Iowa Acts ch. 1202, § 46 (act "applicable to agency proceedings commenced on or after [July 1, 1999]"). Be-

cause Caselman filed his claim for benefits in August 1998, he argues the former version of chapter 17A should apply. Wal–Mart counters that the new version of the statute applies because the amended act's provisions pertaining to judicial review apply "to the agency action at the time it was taken." 1998 Iowa Acts ch. 1202, § 24 (now codified at Iowa Code § 17A.19(8)(b) (2001)). This would include the enlarged definition of "substantial evidence" which, Wal–Mart argues, demands more scrutiny than prior case law would suggest.[1]

▮ Wal–Mart has the better argument, at least on its first point. The statutory amendment pertaining to judicial review is consistent with the well-established rule that "statutes controlling appeals are those that were in effect at the time the judgment or order appealed from was rendered." *Ontjes v. McNider,* 224 Iowa 115, 118, 275 N.W. 328, 330 (1937); *accord Giles v. State,* 511 N.W.2d 622, 624 (Iowa 1994); *James v. State,* 479 N.W.2d 287, 290 (Iowa 1991). The deputy's decision, filed in November 1999, was affirmed by the agency in August 2000. Wal–Mart's petition for judicial review was filed in September 2000 and ruled upon in April 2001. Because the agency action under review did not occur until after the revised statute took effect, the district court correctly applied the amended statutory language in its decision on judicial review.

▮ We do not agree, however, with Wal–Mart's contention that the new "substantial evidence" definition requires a

---

1. The statute, as amended, authorizes the court on judicial review to reverse the agency decision

[b]ased upon a determination of fact clearly vested by a provision of law in the discretion of the agency that is not supported by substantial evidence in the record before the court when that record is viewed as a whole. For purposes of this paragraph . . .

(1) "Substantial evidence" means the quantity and quality of evidence that would be deemed sufficient by a neutral, detached, and reasonable person, to establish the fact at issue when the consequences resulting from the establishment of that fact are understood to be serious and of great importance.

Iowa Code § 17A.19(10)(f) (2001).

"higher threshold" of proof to support the agency's decision. We recently held the revisions were not intended "to increase the intensity of judicial review ... but to ensure that courts actually follow the level of review consistent with the act." *Locate.Plus.Com*, 650 N.W.2d at 612. The amended statutory language merely provides more express guidance in the application of pertinent legal principles. *Id.* In the words of the reporter/draftsman of the amendments, Iowa Code section 17A.19(10)(f), as amended, is not "revolutionary" but merely provides a "much more detailed statement of the law intended under the existing IAPA." Arthur E. Bonfield, *Amendments to Iowa Administrative Procedure Act (1998)* at 68 (1998). Pertinent to this appeal, the amended statute merely reaffirms the notion that courts must not "simply rubber stamp the agency fact finding without engaging in a fairly intensive review of the record to ensure that the fact finding is itself reasonable." *Id.*

■ Recent decisions of this court have noted the amended statute's reaffirmation of other long-established principles of administrative review. Two are particularly pertinent here. First, section 17A.19(10)(f)(3) specifically requires the court to consider record proof that detracts from any challenged finding as well as evidence that supports it. *Dawson v. Iowa Bd. of Med. Exam'rs*, 654 N.W.2d 514, 518 (Iowa 2002); *accord Titan Tire Corp. v. Employment Appeal Bd.*, 641 N.W.2d 752, 755 (Iowa 2002) (citing *Burns v. Bd. of Nursing*, 495 N.W.2d 698, 699 (Iowa 1993)). Second, the amendments to section 17A.19(10)(f) are "[e]ntirely consistent" with the well-established rule that evidence is not insubstantial merely because it would have supported contrary inferences. *Missman v. Iowa Dep't of Transp.*, 653 N.W.2d 363, 367 (Iowa 2002).

With these rules in mind we turn to the substantive issues before us.

### III. Sufficiency of Evidence to Support Commissioner's Awards.

***A. Permanent total disability.*** The fighting issue on appeal is whether the record before the agency furnished substantial evidence to support the commissioner's award of permanent total disability benefits. Wal–Mart argued in district court, and urges in response to Caselman's appeal, that "[t]he overwhelming medical evidence in this case was that Claimant was able to continue his career as a truck driver." Indeed, this is the precise language used by the district court to justify its reversal of the commissioner's ruling. We are convinced, however, that the record—when viewed more objectively—reveals facts that are far less conclusive and that would, in fact, support the inferences drawn by the commissioner.

■ Crucial to the deputy commissioner's decision were credibility findings bearing on Caselman's subjective assessment of his inability to meet the standards required by Wal–Mart—or any other trucking company—in terms of strength and stamina. *See* Iowa Code § 17A.19(10)(f)(3) (adequacy of evidence must be judged in light of "determinations of veracity by the presiding officer who personally observed the demeanor of the witnesses"). The deputy began his factual findings this way:

From my observation of [Caselman's] demeanor at hearing including body movements, vocal characteristics, eye contact and facial mannerisms while testifying in addition to consideration of the other evidence, I find Richard credible, including his self-described physical limitations. *What doubt I may have had about the self-assessment of his limitations was extinguished by the testimony at hearing by Richard's superior at Wal–Mart, the transportation manager,*

*Lisa Martins. Martins stated that Richard was an honest employee and she had no reason to disbelieve Richard's statements concerning his limitations or the numbness in his leg which prevents a return to truck driving.*

(Emphasis added.) Caselman's testimony, corroborated by the testimony of others experienced in the trucking field, described at great length the physical tasks in semi-truck driving, even of the "drop and load" variety. Caselman's most recent assignment at Wal–Mart involved picking up returned merchandise from a variety of stores. This routinely involved loading items weighing from five to 160 pounds, often without the availability of dollies or store-staff help. More fundamental demands of semi-truck driving, however, range from the basic necessity of pulling one's weight up into the cab to the more demanding tasks of engaging the fifth-wheel pin, cranking the trailer dolly, adjusting the rear wheels, transferring hoses, opening cargo doors and moving docking plates into place. As correctly noted by the deputy, all these routine tasks "require more force than allowed by any doctor in this case." For this reason, we believe it reasonable for the deputy to characterize Wal–Mart's vocational counselor's contrary conclusion as "not mak[ing] much sense." The deputy credited, instead, the report of McLaughlin who entertained "grave reservations" about Caselman's ability to perform the job of truck driver safely, notwithstanding his strong motivation to do so.

Wal–Mart also argued on judicial review that the testimony of Caselman's independent examining physician, Dr. Riggins, must be given little weight because he was "selected" by Caselman's counsel and, hence, not "independent." Echoing Wal–Mart's brief, the district court's ruling asserts that the deputy "disregarded the evidence of [six other] doctors and relied on the 'suspicions' expressed by Claimant's doctor, Dr. Keith Riggins." The deputy's credibility assessment on this point, however, defeats the court's expressed concern. In the deputy's words,

the work restrictions imposed by the physicians, including those of Dr. Riggins, are causally related to the work injury. *Dr. Riggins' views must be given considerable weight as they are the most recent, they are from a board certified orthopedic surgeon and they are the most consistent with Richard's credible testimony.*

(Emphasis added.) Substantial evidence in the record supports the deputy's credibility finding. By contrast to the other physicians and orthopedic surgeons who testified, Dr. Riggins is the only one who is board certified not only in orthopedic surgery but in the evaluation of disabilities and occupational medicine. A reasonable fact finder could assume that his tendency to accord greater weight to Caselman's subjective complaints of pain merely reflects his enhanced credentials in making such assessments, rather than some attempt to satisfy a "paying" customer. The court's contrary implication is not warranted under this record.

The district court also criticized the deputy for "ignoring" the fact that Caselman has twice applied for, and been denied, social security disability benefits. Even more is made of the fact that the deputy did not mention the conclusions drawn by the doctors who reviewed Caselman's medical history in that connection. The record reveals, however, that those doctors never examined Caselman. And given the markedly different standards applicable to receipt of awards in these different realms, we do not believe the deputy's failure to address Wal–Mart's argument on this

score detracts materially from its other findings.

■ It would unduly lengthen this opinion—and add little to our jurisprudence—to recount in further detail all of the facts that support and detract from the deputy commissioner's findings and conclusions. Our task is to "broadly and liberally apply [the deputy's] findings to uphold rather than to defeat the agency's decision." *Al–Gharib*, 604 N.W.2d at 632. While those with desk jobs might question how a person with no more than a common back injury could be suddenly rendered totally and permanently disabled, the record before us contains substantial evidence to support that conclusion. The fact that different inferences could be drawn from the same record does not diminish the soundness of the deputy commissioner's findings and conclusions "[w]hen that record is viewed as a whole." *See* Iowa Code § 17A.19(10)(f)(3).

Quoting the commissioner in *Al–Gharib*, this court observed that "[t]otal disability does not mean a state of absolute helplessness." *Al–Gharib*, 604 N.W.2d at 633. The question is whether Caselman's work-related injury has "wholly disable[d][him] from performing work that [his] experience, training, intelligence, and physical capacities would otherwise permit [him] to perform." *Id.* Credible evidence in the record made before the agency supports the deputy's conclusion that Caselman is no longer able to engage in employment for which he is fitted. *See id.* And although, in the deputy's words, the parties' vocational experts held "radically divergent" views on this point, that fact did not thereby free the court to substitute its judgment for the presiding officer who observed the testimony first-hand. We therefore reverse the judgment of the district court and remand for entry of an order affirming the agency's award.

*B. Penalty award.* Caselman also challenges the district court's reversal of the agency's $8000 award of penalty benefits. He claims substantial evidence supports the award based on the commissioner's finding that Wal–Mart delayed unreasonably in rectifying its original error of paying under lower, Kansas rates and thereafter making several payments late. Wal–Mart counters that reversal and remand were justified under the record. It does not deny, however, that some amount of penalty benefits are warranted in this case.

■ At the outset Wal–Mart challenges the commissioner's consideration of other recent cases in which penalty benefits had been assessed against the company. However in laying out the factors the commissioner may consider when imposing penalty benefits, this court has specifically included "the prior penalties imposed against the employer." *Robbennolt v. Snap–On Tools Corp.*, 555 N.W.2d 229, 238 (Iowa 1996); *accord Meyers v. Holiday Express Corp.*, 557 N.W.2d 502, 505 (Iowa 1996). Such evidence was properly considered by the deputy in fashioning the award and furnished no grounds for reversal of the award by the district court on judicial review.

Penalty benefits are authorized under Iowa Code section 86.13. The relevant portion of that statute states:

> If a delay in commencement or termination of benefits occurs without reasonable or probable cause or excuse, the workers' compensation commissioner shall award benefits in addition to those benefits payable under this chapter . . . up to fifty percent of the amount of benefits that were unreasonably delayed or denied.

Iowa Code § 86.13.

■ The key to determining whether penalty benefits should be awarded is

whether the employer's actions were reasonable. *Gilbert v. USF Holland, Inc.,* 637 N.W.2d 194, 198 (Iowa 2001); *Christensen v. Snap–On Tools Corp.,* 554 N.W.2d 254, 260 (Iowa 1996); *Meyers,* 557 N.W.2d at 504–05; *Robbennolt,* 555 N.W.2d at 236–37. Delay may be justified if "(1) the delay was necessary for the insurer to investigate the claim or (2) the employer had a reasonable basis to contest the employee's entitlement to benefits." *Meyers,* 557 N.W.2d at 504. In other words, a reasonable basis for delay is synonymous with a fairly debatable claim. *Meyers,* 557 N.W.2d at 504.

Two delays in payment are at issue here. First, when Wal–Mart commenced paying Caselman's workers' compensation benefits, it applied the lower Kansas rate rather than the rate required by Iowa law. Wal–Mart argues that it was at least fairly debatable that Caselman was entitled to Kansas, rather than Iowa, workers' compensation benefits. Its argument is not persuasive.

Kansas law grants it jurisdiction of worker's injury claims outside the state if Kansas is the principal place of employment. Kan. Stat. Ann. § 44–506 (1999). Caselman was dispatched out of Kansas but worked in several states, made his employment contract in Iowa, and was injured in Iowa. The deputy observed that Wal–Mart would have challenged Iowa's jurisdiction if there had been a fairly debatable basis for Wal–Mart's claim that Kansas law applied. Moreover, the company admitted in August 1998 that paying benefits under Kansas law was in error but it failed to pay the differential until October 1998. Although Wal–Mart eventually paid interest as a result of the error, we agree that substantial evidence supports the deputy's finding that Wal–Mart's position on the point was not fairly debatable. A penalty award was thus justified.

The deputy also assessed the penalty because weekly disability checks were not delivered to Caselman on time. Workers' compensation checks must be mailed or personally delivered on the date the payment is due. *Meyers,* 557 N.W.2d at 505. Imposition of a penalty is unjustified only if the employer has a reasonable excuse for the delay and "conveys that reason to the employee contemporaneously with the beginning of the delay." *Id.* at 504.

Wal–Mart admits that at least two or three checks were late. Based on Caselman's testimony, however, the deputy could have found that between ten and twenty checks were mailed late. So also could the deputy infer from the record a lack of contemporaneous explanation for the delay. For example, not until sending a letter dated April 7 to Caselman's counsel did the company explain the reason for delay of payments due March 16 and March 30.

The district court rejected these findings, seemingly satisfied that the delay merely resulted from "a recurring problem with Wal–Mart's auto pay computer program for workers' compensation benefits." Like the deputy, we do not believe this explanation comports with the spirit of section 86.13. While isolated delays occasioned by computer glitches may be unavoidable and, hence, reasonable, recurring and unexplained technical problems affecting the timely receipt of benefits are not. In short, the record amply supports the penalty award imposed by the agency. We therefore reverse and remand for entry of an order affirming that award.

**REVERSED AND REMANDED.**