# IN THE COURT OF APPEALS OF IOWA

No. 24-1195
Filed June 18, 2025

**SCOTT LARSON,**
    Plaintiff-Appellant,

**vs.**

**IOWA GRAIN INDEMNITY FUND BOARD,**
    Defendant-Appellee.
_____

Appeal from the Iowa District Court for Hancock County, Gregg R. Rosenbladt, Judge.

A soybean grower appeals the district court's ruling on judicial review affirming the Iowa Grain Indemnity Fund Board's denial of his claim for indemnification. **AFFIRMED.**

David J. Stein, Jr. (argued) of Stein Law Office, Milford, and David J. Siegrist of Siegrist & Jones, P.C., Britt, for appellant.

Brenna Bird, Attorney General, Eric Wessan, Solicitor General, Brenna Stoltze (argued), Assistant Solicitor General, and Jacob J. Larson, Assistant Attorney General, for appellee.

Heard at oral argument by Tabor, C.J., and Ahlers and Langholz, JJ.

**LANGHOLZ, Judge.**

Purchasing grain "is a highly regulated business" in Iowa. *Marolf v. Iowa Grain Indem. Fund Bd.*, 442 N.W.2d 608, 610 (Iowa 1989). As part of our regulatory scheme, the legislature created an administrative process to lessen the blow to farmers if a licensed grain dealer files for bankruptcy. The Iowa Grain Indemnity Fund Board reviews claims by sellers who contracted with now-defunct grain dealers, and if it finds a claim derives from a covered transaction, it may indemnify ninety percent of the loss. Covered transactions include those where title to the grain is transferred within six months of the dealer's bankruptcy filing.

Scott Larson is a soybean farmer who filed a claim with the Board seeking indemnity for a transaction with a licensed grain dealer, Global Processing Inc., which filed for bankruptcy on October 24, 2022. Trouble is, all the grain was delivered and accepted, and thus title transferred to Global, by April 14—more than six months before Global filed for bankruptcy. So the Board denied his claim. Larson sought judicial review and the district court affirmed. He now appeals, arguing the Board's factual findings are not supported by substantial evidence.

Reviewing the administrative record as a whole, we agree substantial evidence supports the Board's finding that Larson transferred title to the grain outside the six-month indemnity window. Global's settlement sheet contained all the necessary information for final payment, including each bushel's pricing, no quality deductions, the checkoff amount, and the payment check number. While Global never signed and delivered the check, the Board could reasonably infer that failure was because of its insolvency—not a refusal to accept the grain. And Global did not behave as if Larson retained title. We thus affirm the Board's denial.

I.

*The Grain Depositors and Sellers Indemnity Fund.*  In 1986, the legislature created a fund within the state treasury to help cover losses to grain sellers and depositors after licensed grain dealers or warehouses become insolvent.  *See* 1986 Iowa Acts ch. 1152, §§ 31–40 (now codified at Iowa Code chapter 203D (2022)).  All licensed grain dealers and warehouse operators pay into the fund, which provides a pot of money to indemnify grain sellers and depositors should obligations go unpaid.  Iowa Code §§ 203D.2, 203D.3(2).  To administer the fund, the legislature formed the Iowa Grain Indemnity Fund Board, which hears claims from aggrieved grain sellers and depositors.  *Id.* § 203D.4(2).

There are limits on receiving indemnity funds, two of which are relevant here.  First, a claim must be filed within 120 days of an "incurrence date."  *Id.* § 203D.6(2)(b).  An incurrence date is either the date the grain dealer or warehouse files for bankruptcy or the date when their state license expires, is cancelled, or is revoked.  *Id.* §§ 203D.6(2)(a); 203.10, 203C.10.  And second, the claim must "derive[] from a covered transaction."  *Id.* § 203D.6(4)(d).  To qualify, a seller must have "transferred title to the grain to a licensed grain dealer . . . within six months of the incurrence date."  *Id.*  If a claim is eligible for payment, the Board calculates the dollar value and pays ninety percent of the loss, up to $300,000 per claimant.  *Id.* § 203D.6(6), (8).

If the Board initially denies a claim, the applicant may appeal internally and request an evidentiary hearing before the Board.  Iowa Admin. Code r. 21-94.9(1).  After a hearing, the Board issues a written decision.  *Id.* r. 21-94.9(2).  And final Board decisions are subject to judicial review.  *See generally* Iowa Code § 17A.19.

*Larson's Claim.* In March 2021, Larson entered into a production agreement to grow food grade soybeans and sell the resulting production to Global, a licensed grain dealer and warehouse. The agreement set certain quality standards, which required Larson to provide Global with a five-pound representative sample of beans within thirty days of harvest, which Global would assess for various conditions, including GMO contamination, moisture levels, and the presence of other crops or mold. Global also generally reserved the right to request additional samples and reject or discount grain that did not meet its quality standards. For delivered bushels, "[p]remiums will be paid" under the agreement's pricing terms "only after the quality and purity results are obtained by [Global] on the screened product." And if the grain is priced, then Global must pay Larson within thirty days of delivery.

Between April 11 and April 13, 2022, Larson delivered 5648.71 bushels of soybeans to Global. On April 14, Global created a settlement sheet, which contained final pricing. In that document, Global noted no deductions for foreign material, dirt, or moisture. And after deducting $439.83 for checkoffs,[1] Global priced Larson's delivery at $87,525.89. The settlement sheet was stamped as "PAID APR 14, 2022" and Global internally prepared a printed check to Larson for that amount the same day. But Global never signed the check nor sent it to Larson.

Global's failure to tender payment to Larson was not an isolated incident. On October 6, the Iowa Department of Agriculture and Land Stewardship

---

[1] Soybean checkoffs are federally mandated deductions made by the purchaser of "one-half of 1 percent of the net market price," which are paid into a fund that promotes state and federal soybean research and education initiatives. *See generally* 7 U.S.C. §§ 6301, 6304(*l*)(1)(A)(ii).

suspended Global's grain dealer and warehouse licenses for repeatedly failing to mail or deliver checks to grain sellers within five days of issuance, *see id.* § 203.8(1)(b), and for failing to have sufficient funds to cover its remaining purchase obligations, *see id.* §§ 203.3(4), 203C.6(4). And on October 24, Global filed for Chapter 11 bankruptcy.

The Department promptly sent notices to parties—including Larson—who may have unpaid balances from Global, notifying them of the bankruptcy. The notice instructed that October 24 was the "claim incurrence date" for indemnity purposes and provided a copy of the form for submitting a claim to the Board.

Larson submitted a claim for indemnification for the unpaid April delivery. After review, the Board denied his claim, finding "[a]ll grain delivered and sold occurred more than six months from the incurrence date, October 24, 2022," and thus was not a covered transaction. Larson internally appealed the denial, arguing that because Global retained the right to reject or discount his grain, the transaction was not completed upon delivery. Instead, he argued that title did not transfer until Global "had given acceptance of the grain including the price to be paid for [his] grain which occurred on or about May 14, 2022."[2]

After an evidentiary hearing, the Board again denied his claim. The Board found that on April 14, "[t]he soybeans were evaluated, pricing was established, and a check for the full amount due was cut. No soybeans were returned to Larson." And so, title was transferred to Global on April 14. Because April 14 is

---

[2] Before the Board, Larson also challenged the appropriate incurrence date. But he has abandoned that challenge in this judicial review proceeding.

more than six months from October 24, Larson's claim was not a covered transaction.

Larson then petitioned for judicial review.[3] There, he renewed his argument that Global's quality-review process and failure to deliver the drafted check "shows that acceptance of and transfer of title to Larson's grain did not occur" on April 14. Without substantial evidence that Global indeed "accepted" his grain on April 14, he argued the Board's denial should be reversed. The Board resisted, pointing to Global's pricing, lack of quality deductions, settlement, and preparation of payment for the final delivery as evidence supporting the Board's finding.

The district court affirmed the Board's denial. It reasoned "a number of factors" provide substantial evidence that title to the grain transferred on April 14, including "the grain was physically delivered to Global," it was "weighed and scale tickets were generated," and "[a] check and a settlement statement were completed." As for Larson's quality-review argument, the court found no evidence showing "Global rejected the beans or had any concerns about quality standards," as Global did not assess fees or costs for storing or drying any in-review grain. Because "title to the grain passes on delivery," *see Marolf*, 442 N.W.2d at 610, and the record evidence showed Larson delivered the soybeans on April 14, the court thus found his claim was not a covered transaction.

Larson now appeals.

---

[3] Larson's petition at first sought reversal under all fourteen judicial-review grounds. *See* Iowa Code section 17A.19(10)(a)–(n). Yet when it came time to brief his petition, he only cited ground "f," which allows reversal when a determination of fact is not supported by substantial evidence. *See id.* § 17A.10(1)(f). So that was the ground addressed by the district court.

II.

*Judicial review.* Parties who are aggrieved by final agency action may petition the district court for judicial review. *See* Iowa Code § 17A.19(1). "The burden of demonstrating the required prejudice and the invalidity of agency action is on the party asserting invalidity." *Id.* § 17A.19(8)(a). Judicial review is not a generalized, free-wheeling reappraisal of an agency's decision or action. Rather, "[t]he validity of agency action must be determined in accordance with the standards of review" set forth in Iowa's Administrative Procedure Act. *Id.* § 17A.19(8)(b). Parties may ask courts to reverse, modify, or remand agency action under one or more of the fourteen grounds provided in the Act, and courts must "make a separate and distinct ruling on each material issue on which the court's decision is based." *Id.* § 17A.19(9), (10)(a)–(n). In an appeal of a district court's ruling on judicial review, we apply the same statutory standards of review of the agency action as the district court. *See Carreras v. Iowa Dep't of Transp.*, 977 N.W.2d 438, 444 (Iowa 2022).

Larson seeks reversal under paragraph "f," which allows for relief if the agency action is "[b]ased upon a determination of fact clearly vested by a provision of law in the discretion of the agency that is not supported by substantial evidence in the record before the court when that record is viewed as a whole." Iowa Code § 17A.19(10)(f). "Substantial evidence" is "the quantity and quality of evidence that would be deemed sufficient by a neutral, detached, and reasonable person, to establish the fact at issue when the consequences resulting from the establishment of that fact are understood to be serious and of great importance." *Id.* § 17A.19(10)(f)(1).

Substantial-evidence review affords great respect to the agency's adjudicative process and resulting findings.  Even if we "may have drawn a different conclusion as fact finder" after our "fairly intensive" review of the record, that is not enough to set aside the agency's finding.  *Cedar Rapids Cmty. Sch. Dist. v. Pease*, 807 N.W.2d 839, 845 (Iowa 2011) (cleaned up).  Instead, giving due weight to the agency's first-hand view of the evidence and its preferred position to assess witness credibility, "our task is to determine whether substantial evidence, viewing the record as a whole, supports the findings actually made." *Id.*

*Substantial evidence.*  Consistent with grain purchasing being "a highly regulated business," *Marolf*, 442 N.W.2d at 610, statutes and regulations provide a framework for assessing when title to delivered grain transfers, *see generally* Iowa Code ch. 203, Iowa Admin. Code ch. 21-91.  Here, licensed grain dealers must "pay the purchase price to the seller for grain upon delivery or demand by the seller, but not later than thirty days after delivery by the seller."  Iowa Code § 203.8(1)(a).  "Delivery" is "the transfer of title to and possession of grain by a seller to a grain dealer or to another person in accordance with the agreement of the seller and the grain dealer." *Id.* § 203.8(2)(a).  So title transfers on delivery, as set forth under the purchase agreement.  *See also Marolf*, 442 N.W.2d at 610.

There is no dispute that Larson brought roughly 5600 bushels of soybeans to Global between April 11 and April 13, 2022.  And there is also no dispute that on April 14, Global priced those bushels, deducted the soybean checkoff percentage from the net market price, agreed to pay Larson $87,525.89, internally created a check to Larson for that amount, and stamped the settlement sheet as "PAID APR 14, 2022."

Despite that evidence, Larson insists title did not transfer on April 14 because under the agreement, Global could still reject any soybeans that did not meet its quality standards. Larson's reasoning goes like this: Global could have conducted further quality testing on the bushels after April 14, and because Global never sent Larson the check for those bushels, that means it had not yet "accepted" the bushels, delaying the date when title transferred by thirty days to May 14—the date Larson agrees payment was due.

But the Board's contrary finding that title transferred on April 14 is supported by substantial evidence. First, the settlement sheet shows Global intended to pay in full on April 14, concluding the sale. The Department of Agriculture and Land Stewardship regulates settlement sheets, setting forth required contents and terms. *See* Iowa Admin. Code r. 21-91.11(4). Among other items, the sheet must indicate the "method of settlement," including (1) "[i]f priced, the price per bushel, the quantity of grain priced and the date of pricing"; and (2) "[i]f paid for, the date, price per bushel, the quantity of grain paid for, the amount of payment and check number or electronic funds transfer number." *Id.* r. 21-91.11(4)(f)(1)–(2). The April 14 settlement sheet contained all the information necessary for priced and paid-for bushels—it listed each bushel price, the number of bushels, the date of pricing, the amount paid, and the check number. And Global stamped the sheet as "PAID." So the settlement sheet's pricing and check information supports the Board's finding that the grain was delivered, and title was transferred, on April 14.

Second, even Larson's position that payment was due under the agreement on May 14 buttresses—rather than undermines—the Board's finding. The agreement required Global to pay Larson within thirty days "if grain is priced." So

payment would only be due on May 14 if the grain had been finally priced on April 14, as the Board found. If Larson were correct that the grain had not yet been accepted on April 14—and thus could still be rejected or discounted—then pricing would not have yet been established, and payment would not have been due thirty days later as Larson concedes it was. And so, neither the agreement's thirty-day payment provision nor any other term in the agreement provides any basis to find that the transfer of title was delayed past April 14.

Third, the Board could have reasonably inferred that the delay in payment was not because Global was still assessing the bushels, but because Global was insolvent and could not pay. The record includes Global's license-suspension order, which specifically found that it failed to deliver many checks within five days of issuance and lacked sufficient funds to cover its current obligations. Indeed, Global's check to Larson was one of the issued-but-unsent checks recovered during the Department's licensing investigation. That Larson urges a different inference is not enough under substantial-evidence review. *Wal-Mart Stores, Inc. v. Caselman*, 657 N.W.2d 493, 401 (Iowa 2003).

And fourth, Global's settlement amount and post-delivery conduct reflects transfer of title. No soybeans were ever returned to Larson. Nor did Global deduct fees for storage or drying on the settlement sheet, which would be customary if Global believed it did not yet have title to the grain. *See* Iowa Code § 203C.18 (setting forth receipt requirements when grain warehouses store grain); Iowa Admin. Code r. 21-91.11(4)(f)(4) (requiring settlement sheets to contain the warehouse "receipt number, date and quantity of grain transferred" if grain is being stored). And the settlement statement included a checkoff deduction, indicating

all priced grain was indeed purchased. *See* 7 U.S.C. § 6304(*l*)(1)(A)(i)–(iii) (requiring checkoff to be deducted at the time of the first purchase of soybeans).

In sum, when reviewing the record as a whole, substantial evidence supports the Board's finding that title to the grain transferred on April 14, more than six months before Global filed for bankruptcy. We thus affirm the Board's denial of Larson's claim and the district court's ruling on judicial review.

**AFFIRMED.**