## IN THE COURT OF APPEALS OF IOWA

No. 15-1598
Filed December 21, 2016

IN RE THE MARRIAGE OF YOUNG B. HUH
AND VERONICA A. HUH

Upon the Petition of
YOUNG B. HUH,
      Petitioner-Appellant/Cross-Appellee,

And Concerning
VERONICA A. HUH,
      Respondent-Appellee/Cross-Appellant.
_____

Appeal from the Iowa District Court for Scott County, Paul L. Macek, Judge.

Both parties appeal the economic provisions of the decree dissolving their marriage. **AFFIRMED AS MODIFIED**.

Gary D. McKenrick of Cartee & McKenrick, P.C., Davenport, for appellant/cross-appellee.

Andrew B. Howie of Shindler, Anderson, Goplerud & Weese, P.C., West Des Moines, for appellee/cross-appellant.

Heard by Vogel, P.J., and Tabor and Mullins, JJ.

**TABOR, Judge.**

This appeal concerns the economic terms of the decree dissolving the marriage of Young and Veronica Huh, whose marital estate exceeds $7 million.[1] Young appeals the district court's valuation of two properties; the provisions for spousal, child, and medical support; and the requirement he maintain life insurance for Veronica. In her cross-appeal, Veronica seeks to increase the support ordered and asserts the court should have granted relief on her claim Young dissipated assets. We amend the decree to incorporate the parties' agreed-upon modifications, reduce Young's life-insurance obligation, and affirm in all other aspects.

## I.     Background Facts and Prior Proceedings

The parties met when Young was a gastroenterology fellow at the University of Pittsburgh and Veronica was working as a full-time pharmacist in New York. After they married in 1994, Veronica worked part time as a pharmacist in Pittsburgh. When their oldest child, C.H., was born in 1995, the parties agreed Veronica would stay home as a full-time mother and homemaker; she has not been employed since then. The parties also have two younger children, H.H. and E.H.

Young completed his fellowship in 1996; thereafter, the parties moved for Young's employment—two years in New Jersey, followed by three years in Rockford, Illinois. In September 2001, the family moved to the Quad Cities, and Young entered into his present medical practice.

---

[1] The parties settled the issues of custody and visitation in the State of Nevada; Veronica was granted physical care of the children.

After moving to Iowa, the family discovered C.H. had special needs; although he was two years ahead of his peers academically, he had difficulty with social interactions. Veronica researched supportive educational programs and discovered a school in Reno, Nevada. The family agreed C.H. would complete high school in Reno. The original plan for Veronica's parents to live with C.H. in Nevada became impractical due to their health issues. Instead, Veronica started a household in Nevada, and all three children moved with her. The parties' next oldest child, H.H., is also academically gifted but has faced mental-health issues. The youngest child, E.H., does not have special needs and will reach the age of majority in six years.

Veronica and the children returned to Iowa for school breaks and summer vacations. During the school year, Young would fly to Nevada, usually every weekend he was not on call. After C.H. graduated from high school in May 2014, Veronica and the children returned to Iowa, planning to remain here. But in June 2014, when Young told Veronica he wanted a divorce, she and the children returned to Nevada. At the time of the June 2015 dissolution trial, the parties were both in their early fifties. The children were ages eighteen, sixteen, and twelve; C.H. was entering his sophomore year in college. The parties stipulated to the value of their debt-free homes—$323,881 (Iowa) and $268,502 (Nevada). The court entered its decree on September 24, 2015. Both parties appeal. We review their claims de novo. *See* Iowa R. App. P. 6.907.

## II. Division of Property

The parties accumulated a sizable marital estate and stipulated to the value and distribution of some assets. The district court valued the other assets

and awarded property valued at more than $3,700,000 to Veronica and at more than $3,500,000 to Young.[2]  Although cognizant of the difference in Veronica's favor, the court declined to order an equalization payment, reasoning: "Young will continue to automatically build equity in Gastro Real Estate, L.L.C. at the rate of over $80,000 per year.  In about two years, Young's side of the ledger will easily equal Veronica's and then surpass it."

The parties have agreed to modifications on appeal.[3]  When we add those changes, worth approximately $113,000, to Young's award, he receives more than $3,600,000 in marital property.  Young does not seek an equalization payment on appeal, instead challenging Veronica's need for spousal support. We turn to Young's valuation challenges.

**Huh Real Estate L.L.C.—Hartford, Connecticut.**  During the marriage, the parties bought commercial rental properties and held them in limited liability companies with ownership split equally.  Because Veronica managed the properties, Young did not know the intricacies of the rentals.  In 2006, the parties purchased their Connecticut property for $418,000.  At the time of trial the property was leased to two tenants, but the lower level had been vacant in the past.  Young did not know how long the new tenant had been renting and acknowledged Veronica would know more about the specific dates.

---

[2] Veronica's award included the debt assigned to her.  Young had no debt.

[3] These issues could have been resolved in a post-trial motion, but Young filed his appeal on the same day the dissolution decree was entered, depriving the district court of jurisdiction.  We modify Young's 401(k) to $470,338 in value.  We also modify to award Young a checking account valued at $10,757.  Finally, we modify the value of Young's interest in Gastro Holdings to $462,051.

No expert testimony was provided on valuation. Young testified the current value was $545,400—a 3% annual increase over the ownership period. Veronica believed the property was worth between $418,000 and $450,000. She explained the rental history, issues with delinquent rent, the fluctuating values of commercial real estate in that area, and why she believed the appropriate value remained at the purchase price. In valuing the property at $418,000, the district court noted, "Veronica managed the property and is more familiar with its fair market value." The court believed Young's opinion as to a percentage increase was "mere conjecture or speculation."

On appeal, Young asks us to increase the value of this property. Young's own testimony established Veronica was more knowledgeable about the real estate. We accept the district court's valuation, which is within the range of the credible evidence. *See In re Marriage of Decker*, 666 N.W.2d 175, 180 (Iowa Ct. App. 2003) (deferring to district court when valuations were accompanied by "supporting credibility findings or corroborating evidence.").

**Mineral Interests.** Young invested in various mineral interests. On appeal, he challenges the district court's valuation of FSH Midstream, L.L.C. at $202,500, twice Young's original investment. Relying on evidence presented by Young, the court adopted the valuations made by manager Troy W. Eckard for all five mineral investments. According to Eckard, Young owns a "limited and indirect ownership of a LLC Unit" and Midstream "is successfully making income and performing as expected." Eckard explained Midstream made a distribution each year that covered Young's tax liabilities for this investment.

Young complains the district court did not apply the 25% to 35% marketability discount Eckard said "may" apply, and Young seeks a reduction in the property's value by applying the discount. We note Eckard also clarified he could provide a better estimate of the asset's value in the future.[4] The district court's valuation was within the range of the evidence; we affirm. *See id.*

**Veronica's Dissipation Claim.** Veronica asserts Young's cash withdrawals ($126,000), stock sales resulting in losses ($17,274), and costs relating to his newly leased Porsche ($32,182) constitute dissipation of assets. She claims Young's actions "established [his] intent to hide, deplete, and/or divert marital assets."

In making a property distribution, "it is proper for the court to consider a person's dissipation of assets." *In re Marriage of Olson*, 705 N.W.2d 312, 317 (Iowa 2005). We consider "whether the alleged purpose of the expenditure is supported by the evidence, and if so . . . whether that purpose amounts to dissipation under the circumstances." *See In re Marriage of Fennelly*, 737 N.W.2d 97, 104 (Iowa 2007) (citation omitted). The court found Young's actions were more for "control" as opposed to dissipation. Noting Young's attorney fees "approach $300,000," the court found any "dissipation" was caused by "the

---

[4] Eckard's valuation for the June 2015 trial provided:
> A caveat provided in [the $202,500 Midstream valuation] is that such an investment has not been appraised by third-party's internal assumption by the managing member. It should also be noted the Manager [Eckard] owns a significant interest in [Midstream]. The full and potential estimated value would be best noted after two to three full operating years by the company, which would be in 2016 or 2017. It also would require the asset to have a four-year time frame in order to recognize value relative to distributions and continued operational success.

tenacity of the parties in litigating this matter" and concluded Young did not dissipate assets.[5] We evaluate each of Veronica's claims in turn.

After the parties separated, Young made a series of cash withdrawals over six weeks, all in the amount of $9000, totaling $126,000. The district court found Young's pattern of withdrawals "in amounts just below the federal reporting requirement for cash transactions strongly suggests a motive to, at a minimum, hide this asset or to give a colorable and untraceable argument that some of the money simply evaporated in the form of living expenses." The court also found while Young paid his Iowa attorneys $27,000 in cash, it was "highly skeptical" Young spent the remainder of the cash on unspecified "living expenses," even though Young claimed only $75,000 remained. Finding Young had accounted for only $27,000 of the withdrawals, the court deducted that amount from $126,000 and credited Young with $99,000 in cash. Because the district court awarded the unaccounted-for cash to Young in its distribution of property, we find no need to further modify the division of assets.

We next address Young's sale of equities. On August 7, 2014, Young sold five equity positions in the parties' joint brokerage for more than $173,000, transferring the proceeds into an account in his name, resulting in a loss of

---

[5] Bank records show Young moved over $600,000 out of joint accounts and into his own accounts in August 2014. Exhibit 10 lists the parties' assets on May 31, 2014, the month before Young told Veronica he wanted a divorce, and again on May 31, 2015. During that one-year period, the parties sustained a net loss of $296,000. In briefing and during oral argument, counsel for Veronica claimed that but for Young's dissipation of assets, the court would have had $300,000 to $400,000 more to distribute and sought an equalization payment on appeal. The record and testimony show both parties transferred assets between numerous accounts before trial. Like the district court, we find "Veronica did not identify any specific discrepancies."

$17,274 to the parties. Like the district court, we conclude "the stock losses were attributable to market forces as opposed to an intentional waste of assets."

Finally, we consider Veronica's claim Young's lease of a Porsche constitutes dissipation of $32,000. Young's employer deducted that expense from his distributions. One of the factors in identifying dissipation is whether an outlay by one spouse was atypical of the expenditures made by the parties before the breakdown of the marriage. *See In re Marriage of Kimbro*, 826 N.W.2d 696, 701 (Iowa 2013). Assuming without deciding that leasing the Porsche constituted dissipation, we decline to modify the decree on this ground. Veronica is receiving more assets, and Young is not requesting an equalization payment. Applying $32,000 to the property distribution would result in Young forgoing a smaller equalization payment. Accordingly, we conclude Veronica is not entitled to relief on her dissipation claim.

To summarize, we adopt the parties' agreed-upon modifications, uphold the district court's property valuations, and reject Veronica's dissipation claim. As a result, Young's distribution tops $3,600,000 and Veronica receives more than $3,700,000 in marital property.

### III. Spousal Support

Young's primary objection to the decree centers on the alimony award of $13,000 per month. Alimony, or more formally spousal support, "is a stipend to a spouse in lieu of the other spouse's legal obligation for support." *See In re Marriage of Tzortzoudakis*, 507 N.W.2d 183, 186 (Iowa Ct. App.1993). Contrary to Young's position, we conclude the district court achieved equity in the alimony award.

**Earning Abilities.** The district court determined Young's annual income from his medical practice was $600,000.[6] The court reached that figure by averaging Young's employment income from his 2011 to 2013 tax returns, noting 2014 was an aberration given the stress of the dissolution and Young electing not to be on call. Young claims the court should have set his income at $585,000. Upon our de novo review, we agree with the district court that Young's "annual W-2 income in the future will be $600,000."

On the other hand, the district court opined Veronica was unable to secure meaningful employment given her poor health and time out of the workforce. Veronica testified she started having "joint swelling, and stiffness, and tiredness" when their youngest child was two years old, so the parties hired a full-time nanny. Veronica sought medical treatment for her symptoms in 2007, seven years before the dissolution trial. Her treating doctor diagnosed an undifferentiated connective tissue disorder and prescribed medications. Veronica's symptoms improved for the first two years she lived in Reno, but worsened with the stress of the divorce. Veronica testified she could not work all day at any job where she could not rest.

Young supported Veronica's need for treatment during the marriage. But during the dissolution, he offered opinions from two doctors, who examined only her medical records, that she did not meet the criteria for a rheumatological

---

[6] Young has practiced his gastroenterology specialty in the Quad Cities since 2001 as a one-fourth shareholder and employee of Gastroenterology Associates, P.C. As an employee, in addition to a base salary, Young is paid for performing administrative duties and receives quarterly bonuses based on his productivity, one factor being the number of procedures he performs. Additionally, his employer pays for the lease payments on his car, his car insurance, six weeks of vacation, $2500 in professional dues, and his family health insurance.

disease. Young claims Veronica could earn $121,000 per year as a pharmacist. But Veronica has not worked as a pharmacist since 1995—instead devoting her time to the three children and the family homes.

The court believed Veronica's testimony that her "activities are limited by the symptoms of her disorder. Whether these symptoms are caused by a physical disorder or are exclusively psychological matters little. Again, the symptoms existed before any breakdown in the marriage, and Young assisted her in obtaining care." The court found the diagnosis by Veronica's treating physician was more persuasive than Young's experts, who did only a record review.

Although we decide the issues anew, we give weight to the factual findings of the district court. *See In re Marriage of McDermott*, 827 N.W.2d 671, 676 (Iowa 2013). We must "pay very close attention" to the district court's credibility assessment because we necessarily forfeit "the impression created by the demeanor of each and every witness as the testimony is presented." *See In re Marriage of Vrban*, 359 N.W.2d 420, 423 (Iowa 1984); *see also Fennelly*, 737 N.W.2d at 101. Like the district court, we credit Veronica's testimony and the diagnosis of her treating physician in concluding her health issues constrain her ability to return to the workforce.

**Calculating Amount of Support.** The district court found "it is infeasible [Veronica] will become self-supporting from employment income." The court noted an application of the guidelines in *In re Marriage of Gust* to Young's $600,000 annual income would support an alimony award of $15,000 per month or $180,000 per year. *See* 858 N.W.2d 402, 416 n.2 (Iowa 2015) ("While clearly

not binding on an Iowa court, the . . . guidelines nonetheless provide a useful reality check with respect to an award of traditional spousal support."). Using the statutory factors[7] and noting the Huh marriage lasted nearly twenty-one years, the court awarded Veronica traditional spousal support of $13,000 per month, or $156,000 per year, until either party died or Veronica remarried. The court reasoned Young could pay alimony, child support, and his own $14,000 in monthly expenses from his earned income and still have around $3000 per month in earned income to save or spend. Finally, the court recognized Young's child-support obligation will end in approximately six years, thereby increasing his ability to pay alimony from his earned income.[8]

On appeal, Young compares this case to *In re Marriage of Mauer*, where the court ordered a husband earning $1,000,000 per year to pay the homemaker spouse $12,600 per month until she reached age sixty-six and six months and to

---

[7] Iowa Code section 598.21A(1) (2013) provides the court should consider all of the following factors in determining spousal support:
        a. The length of the marriage.
        b. The age and physical and emotional health of the parties.
        c. The distribution of property . . . .
        d. The educational level of each party at the time of marriage and at the time the action is commenced.
        e. The earning capacity of the party seeking maintenance, including educational background, training, employment skills, work experience, length of absence from the job market, responsibilities for children under either an award of custody or physical care, and the time and expense necessary to acquire sufficient education or training to enable the party to find appropriate employment.
        f. The feasibility of the party seeking maintenance becoming self-supporting at a standard of living reasonably comparable to that enjoyed during the marriage, and the length of time necessary to achieve this goal.
        g. The tax consequences to each party.
        . . . .
        j. Other factors the court may determine to be relevant in an individual case.
[8] Veronica will be fifty-six when the youngest child leaves for college.

then pay a reduced amount. *See* 874 N.W.2d 103, 111-12 (Iowa 2016) (clarifying Iowa's statutory factors control over the *Gust* formula). But precedent is of little value because the decision to award spousal support and the determination of the amount are based on the unique circumstances of each case. *See Olson*, 705 N.W.2d at 315. The *Mauer* court's resolution was based on the situation of those parties.[9] *See* 874 N.W.2d at 111.

Second, Young argues even if Veronica cannot return to work, she does not need alimony because she has sufficient income to meet her needs from the commercial real estate yield and the return on her investments. We consider the property settlement in evaluating the alimony award. *See In re Marriage of Hettinga*, 574 N.W.2d 920, 922 (Iowa Ct. App. 1997).

Providing a chart using a 4% return on assets, Young claims with the alimony award, Veronica will have $100,000 more in disposable income then he will have. Young asserts his chart shows "the inequitable and punitive nature" of the court's decision. We reject his assertion.

We find Young's chart to be misleading. He lists income from her properties,[10] but he fails to include his $246,000 annual income from Gastro Holdings. Each year, Young will receive $100,000 more from his property than

---

[9] For example, Carol Mauer was healthy and had an earning capacity of $25,000 per year, while Veronica's poor health leaves her without an earning capacity. *See* 874 N.W.2d at 111-12. Further, Carol Mauer received $855,000 in retirement assets and was "eligible to draw social security benefits based on her own prior employment." *Id.* at 110 n.2, 112. By contrast, Veronica received $65,000 in retirement assets, while Young received $530,000, and Veronica will not earn additional retirement benefits in the future.
[10] Young misstates the amount as $155,878. As the district court noted in the decree, the correct amount is $145,000.

Veronica will receive from her properties.[11] We also find fault with Young's chart concerning the parties' returns on their investments. Without explaining the investment totals he used, Young asserts his annual investment income is $19,404 and Veronica's return is $32,926. Our calculations show Young received $1,119,000 in investments, which at 4% will provide $45,000 each year. Meanwhile, Veronica's $876,000 in investments will provide $35,000 per year.

Finally, Young's chart does not mention retirement assets. At 4% annual earnings, Young's $525,000 in retirement accounts will grow by $21,000 annually, even if he stops contributing. In contrast, Veronica's $65,000 in retirement accounts will grow by $2600 per year, and she will not have an opportunity to increase the balance through earnings.

We conclude Young has the ability to pay $13,000 in monthly alimony—as well as his child support. *See Tzortzoudakis*, 507 N.W.2d at 186 (stating "the ability of the one spouse to pay should be balanced against the needs of the other spouse"). Young's property and investments, excluding retirement accounts, will provide over $100,000 more income to him each year than Veronica receives from her property and investments. His retirement assets also surpass Veronica's retirement assets, and Young has the ability and earnings to shelter additional contributions, Veronica does not. Thus, the parties' unearned income does not lead us to conclude, as Young does, that no alimony is necessary. *See Gust*, 858 N.W.2d at 411 ("Following a marriage of long duration, we have affirmed awards both of alimony and substantially equal

---

[11] When the additional payment of $80,000 from Gastro Real Estate commences in around two years, Young will receive $180,000 more from his properties *each succeeding year*.

property distribution, especially where the disparity in earning capacity has been great.").

In his final challenge to spousal support, Young claims the court inflated the parties' lifestyle and ignored Veronica's "actual needs." Young proposes Veronica "needs" only $10,000 per month in spousal support. Young's counsel repeated this assertion during oral argument.

We measure "need" objectively by what is required for a "spouse to become self-sufficient *at a standard of living reasonably comparable to that enjoyed during the marriage.*" *Id.* (emphasis added). We focus "on the earning capability of the spouses, not necessarily on actual income." *See id.* As discussed above, Veronica's earning capacity is $0 and Young's earning capacity is $600,000 per year. Given Veronica's health issues, the parties' substantial disparity in earning capacity will continue post-divorce. Veronica will need to provide her own medical insurance, while Young's employer pays for his medical insurance. In analyzing the parties' lifestyle, the court found:

> This lifestyle included making investments without the necessity of financing. Virtually every physical need of this family was addressed without any significant concern for cost. The freedom this allowed the family in making any given choice is a lifestyle that was enjoyed by Veronica. The lifestyle did not involve squandering money; the lifestyle allowed building capital in significant amounts. On average, the parties were able to accumulate over $350,000 for each year of marriage.

*See id.* (stating objective standard for need is "based upon the pre-divorce experience and private decisions of the parties, not on some externally discovered and imposed approach to need, such as subsistence or adequate living standards"). We afford the district court considerable latitude in

determining spousal support and will amend the award only where the court has failed to do equity. *Olson*, 705 N.W.2d at 315. Here, we conclude equity requires us to uphold the order of $13,000 per month in spousal support to Veronica.[12]

### IV.    Child Support

Initially, the parties agree the decree should be modified to grant Veronica both tax dependency deductions, and we modify accordingly.

According to Iowa's guidelines for child support, parties with a combined monthly net income of $25,000 have a combined $3624 support obligation for two children and $2598 for one child. *See* Iowa Ct. R. 9.26. Because Veronica and Young's combined monthly net income *exceeds* $25,000, the guidelines place their support obligation "within the sound discretion of the court . . . but shall not be less than" the support obligation for a combined monthly net income of $25,000. *See* Iowa Ct. R. 9.26(3).

The court found Young had a net monthly income of $41,000.[13] The court found Veronica would receive $9000 in net monthly income from her commercial real estate.[14] Those net monthly income figures yielded the court's ratio of 82%

---

[12] On her cross-appeal, Veronica summarily asserts the court's $13,000 alimony award was too low; she sought over $20,000 per month at trial. Because she provides no rationale for increasing the award, we decline to do so.

[13] Adding Young's earned income of $600,000 to his approximately $246,000 in investment income from Gastro Holdings results in $846,000 gross annual income. At a tax rate of 40%, Young will pay $338,400 in taxes, leaving $507,600 net annual income, or $42,300 monthly income, which the court rounded down to $41,000.

[14] The court found Veronica's commercial property would yield $145,000 per year. Taking Veronica's $145,000 annual yield times the 28% tax bracket for incomes between $91,000 and $190,000 results in Veronica's tax of $40,600. When Veronica's tax is deducted from her $145,000 annual yield, she has $104,400 net annual income, or $8700 net monthly income. The court rounded this up to $9000.

from Young and 18% from Veronica.[15]  Applying Young's 82% to the two-child minimum payment of $3624, the court found Young's minimum support for H.H. and E.H. was $2962 per month.  Based on the family's past spending on special programming for their children, the court found Veronica would pay around $5000 per month on mentors, tutors, camps, and lessons for H.H. and E.H. Using its discretion, the court ordered Young to pay $2000 of that amount, with Veronica bearing the other $3000 of those costs.  Thus, Young pays $4962 per month to support two children and $3123 per month when only one child is eligible for support.

Young attacks the court's 82:18 ratio of his income to Veronica's income. Because Veronica will not have earned income and Young's post-divorce annual income will be higher than $500,000, we reject Young's proposed ratio of 59% for him and 41% for Veronica.  We also reject Veronica's summary proposal that we increase Young's child support to $7962 per month for two children.  *See Midwest Auto. III, L.L.C. v. Iowa Dep't of Transp.*, 646 N.W.2d 417, 431 n.2 (Iowa 2002) (holding random mention of an issue without elaboration or supporting authority fails to preserve the claim for appellate review).  In his reply brief, Young makes a new proposal, asserting a 70% to 30% ratio is appropriate. Because we do not accept Young's calculations, we decline to change the ratio.

Young also asks us to eliminate the discretionary addition of $2000 for two children and $1000 for one child, contending these sums are "not based in reality."  After our de novo review of the record, we agree with the court's

---

[15] The court also stated: "Neither net income calculation considers alimony."  We decline Young's request to include alimony in the calculation of child support.

assessment that the middle child has special needs that call for a continued investment of the family's resources. Further, we agree with the court's explanation:

> In respect to the children's education and all other aspects of learning, the parties spared virtually no expense. This is what makes this fact pattern unique. The proposition of setting up and maintaining two separate households many hundred miles apart is a testament to how focused the parties were on the success of the children. Not only did this require a large expenditure of money, but it also required a large expenditure of psychological and emotional capital. Veronica estimates that she will spend $5000 per month, or $60,000 per year, on [the minor children's] education. The court finds that this is a fact. She will leave no stone unturned.

In exercising its discretion, the district court was mindful of the proposition that child support "may reflect the standard of living the child would have enjoyed had there not been a dissolution." *In re Marriage of Powell*, 474 N.W.2d 531, 534 (Iowa 1991). Based on the unique facts of this marriage, we conclude the child support set by the district court is a reasonable and necessary amount.

### V. Medical Support

Both parties challenge the court's award of medical support. We uphold the court's 90% to 10% ratio for uncovered medical expenses. Young holds $64,000 in a health savings account and received assets with higher yields; Veronica does not have a health savings account and received assets with lower yields. We interpret Young's testimony as agreeing to provide medical insurance for the children through college and modify the decree accordingly. We reject Veronica's assertion Young also should contribute toward uncovered medical expenses until each child finishes college. During oral arguments, Veronica's

counsel cited no authority for such a requirement, and we find Young's testimony did not encompass this extra obligation.

### VI. Life Insurance

Recognizing Veronica and the children "would hardly be destitute" upon Young's premature death, the court nevertheless decided his death would severely impact their lifestyle and ordered Young to maintain life insurance with death benefits payable to Veronica for $1,500,000 as long as a child-support obligation exists, and after that in the amount of $1,000,000 until Veronica reaches age sixty-six. Then Young was to maintain $400,000 in favor of Veronica "until alimony is no longer due."

Young challenges the requirement he maintain life insurance, pointing out his alimony obligation terminates upon his death and his cumulative child-support obligation is around $250,000. Veronica does not dispute this calculation. Young asserts equity requires any insurance requirement be limited "to the total child-support obligation secured less social security survivor benefits and decreasing as the obligation decreases." *See In re Marriage of Mouw*, 561 N.W.2d 100, 102 (Iowa Ct. App. 1997) (stating an order requiring life insurance "should be limited to the amount necessary to secure an obligation").

A spouse may be required to maintain life insurance for the benefit of the other spouse in a dissolution decree. *Olson*, 705 N.W.2d at 318. When such insurance secures spousal support, which normally ends upon the death of either party, courts require "some significant reason for imposing such a requirement," such as "some demonstrated need to provide funds beyond the obligor's death." *See, e.g.*, *In re Marriage of Weber*, No. 98-1688, 2000 WL 278535, at *10 (Iowa

Ct. App. Mar. 15, 2000). Generally, life insurance secures alimony when the parties have a minimal marital estate and thus need is demonstrated. *See In re Marriage of Debler*, 459 N.W.2d 267, 270 (Iowa 1990) (ordering husband to maintain insurance where the beneficiary-homemaker spouse received only $21,000 in property). Because Veronica received more than $3,700,000 in property, we modify the decree and eliminate the requirement Young secure his alimony obligation with life insurance.

But Young's six-year obligation to pay child support is another matter.[16] Equity requires Young to maintain $500,000 of life insurance in favor of Veronica until his obligation to pay child support ends.

### VII.    Conclusion

The decree shall be amended to reflect the modifications agreed to by the parties. Young's 401(k) is valued at $470,338; his interest in Gastro Holdings is valued at $462,051. Young is awarded a checking account valued at $10,757. Veronica shall be allowed to claim both children as dependents for state and federal income tax purposes. Young shall provide medical insurance for the children through college. In addition, we strike the provision requiring Young to maintain life insurance to cover his spousal-support obligation. We modify and order Young to maintain $500,000 of life insurance in favor of Veronica until his obligation to pay child support ends. In all other respects, the district court's insightful and well-reasoned dissolution decree is affirmed.

**AFFIRMED AS MODIFIED.**

---

[16] The court also ordered Young to pay a portion of his oldest child's current college expenses.